ISRAEL CODDINGTON ET AL. v. NATHAN J. BEEBE AND THE HUDSON COUNTY DRY DOCK AND WET DOCK COMPANY.

1. A floating dock is not a building or a fixture, within the meaning of the first or fifth sections of the mechanics lien law.
2. A lot of land under tide water is not a lot or curtilage, within the meaning of said sections.
3. In order to subject a building to the lien law, it must have been built upon the lot sought to be affected by the lien, and have remained there until the lien attached.
4. A fixture, within the fifth section, must be one attached to a building.
5. In order to subject a building to the lien law, the owner of the building must have some estate in the land on which it stands ; unless this is so, there can be no lien either on the land or the building.
6. The lien law leaves the question of trade fixtures where it finds it.

In case.    Error to the Hudson circuit.

This action was brought in the Circuit Court of the county of Hudson, by Israel Coddington & Co., plaintiffs, against Nathan J. Beebe, builder, and the Hudson County Dry Dock and Wet Dock Company, owners, to recover for lumber, materials, and labor furnished to Beebe, and for the amount of which it was averred that the said company were liable under the mechanics lien law, the same having been applied to a certain building and fixture for manufacturing purposes, &c., known by the name of a floating dock.    The plaintiffs having filed their declaration, the defendants, the Hudson County Dry Dock and Wet Dock Company, demurred, and assigned various causes of demurrer.    The court below overruled the demurrer, and ordered judgment for the plaintiffs. The judgment was removed to this court by writ of error, and on March 10th, 1862, it was reversed, and the record remitted to the court below.    See case, with the pleadings and judgment, 5 *Dutcher* 550.

Leave was then given to the defendants to withdraw the demurrer and plead to the declaration, and thereupon issue was joined, and the case was tried by a jury, who brought in

a special verdict, upon which the court afterwards gave judgment for the defendants. To remove and set aside this judgment, the plaintiffs removed the proceedings, by writ of error, into this court.

The material facts set forth in the special verdict and in the assignment of errors, are so fully recited in the opinion of the court as to make any further reference to them unnecessary.

The case was argued by *S. B. Ransom* and *C. Parker*, for the plaintiffs, and *I. W. Scudder* and *A. O. Zabriskie*, for the defendants.

The opinion of the court was delivered by

VREDENBURGH, J.    Between the 19th day of April, 1859, and the 15th day of July, of the same year, Beebe bought of Coddington $6203 worth of lumber. On the 25th day of April, 1860, Coddington sued the Dock Company, to make Beebe's debt out of their property. He claims to do this by virtue of the mechanics lien law. *Nix. Dig.* 487.* At the trial the jury found a special verdict, upon which the court gave judgment in favor of the Dock Company, whereupon Coddington brought this writ of error.

On the trial, it appeared by the pleadings and the special verdict that the following are the grounds upon which Coddington claims to make the Dock Company pay Beebe's debt, *viz.*, that in the spring of 1859 Beebe agreed to build for the Dock Company a floating dock, a wooden structure one hundred and seventy feet long, eighty feet wide, and seventy-four feet high, with a false bottom in it eight feet deep, and running the whole length of the structure, with an opening and dock above the false bottom into which vessels could be floated; and the whole structure, vessel and all, depressed or elevated by letting in or pumping water out of this false bottom. This floating dock was built on a lot of land hired by the Dock Company, one thousand feet distant from the premises upon which the lien is now sought to be enforced.

*Rev., p. 668.

It was there built in five sections, upon ways, to be launched like other vessels. All the lumber sold by Coddington to Beebe was used by Beebe in building these sections while they were yet on the ways, and before they were launched.

These sections were then launched by Beebe into the tide waters of the Hudson river, and there remained until the spring of 1860, when they were floated to within twelve feet of a pier of the Dock Company at Jersey City, and there so fastened to the pier and to each other that its only motion was to rise and fall with the tide, and with the letting in and pumping water out of its false bottom. It always floats upon the tide waters of the Hudson. The object of the structure is to lift sea-going vessels out of the water, so as to repair their bottom and sides.

The question is whether this structure is liable, under the mechanics lien law, for this lumber. It is so claimed under the first section of said law. *Nix. Dig.** This section provides, " that every building hereafter erected or built within this state shall be liable for the payment of any debt contracted and owing to any person, for labor performed or materials furnished for the erection and construction thereof, which debt shall be a lien on such building and on the land whereon it stands, including the lot or curtilage whereon the same is erected.

In the first place, it is contended that this floating dock is a building, within the meaning of this section. It has been remarked that this is a remedial statute and should be construed liberally. So far as it is remedial that is all true. But this statute also creates new rights, and so far it should be construed strictly. This statute, when it makes one man's debt a lien on another man's land, is not giving a new remedy but creating a new right, and for us to multiply the objects subject to this lien, by way of liberal construction, is being very liberal with other people's property. In ascertaining whether this floating dock is a building with the meaning of the act, we are only to inquire what the legislature meant by the term building.

*Rev., p. 668, § 1.

The next remark I have to make is, that it is obvious from the whole scope of the act, that it only intended to create liens on land, or what in construction of law is land, and not on merely movable property. The act did not intend to give a lien on labor not performed on the land upon which it is to be a lien, nor on lumber before it was made land. It did not mean to give a lien on lumber while it was yet movable, nor until when or after it had become realty. As long as lumber lay in heaps on the land, it was not subject to the statute lien; nor is the lumber, as such, ever subject to this lien. It is not until it has, so to speak, been devoured by the land and converted thus into land, that as land it is the subject of the statute. As soon as the lumber is converted into land, then the land is seized by the lien by reason of the building, and the building because it is part of the land. And from thence it follows that if the land and the building by any chance become separated, the lien is lost on both. The land, because it has lost the building and the increased value thereby given to it, and the building, because it is separate from the land.

Now in order to make a lot of land or a building liable to the statute lien, the following conditions are necessary : *First.* The building, by virtue of which it is sought to charge the land, must be a building within the meaning of the first or fifth sections of the act. *Second.* Such building must have been built and erected on the lot of land sought to be charged. *Third.* Such building, when erected, must stand on land, not float on water. *Fourth.* It must have stood on the land when first erected, and continued to stand thereon until the lien claim was filed. *Fifth.* The owner of the building must have some estate in the land.

It is not necessary that the person who builds should have any particular estate in the land. For he may be either owner in fee for life or for years, but he must have some estate in the land before the lien can attach to either the building or the land. This, I take it, is the foundation of the decision in *Babbitt* v. *Condon,* 3 *Dutcher* 154, where the

Coddington et al. v. Dry Dock Co.

pleadings showed that the builder had no estate whatever in the land. The Supreme Court there held that the lumber merchant had no lien on either building or land. Not on the land, because the builder had no interest whatever in it; and not on the building, because the lien on the building was by virtue of the increased value the building gave to the land in the hands of the owner. It was not until the lumber ceased to be personal property and had put its value in the land, that the lien attached to either. Nor does this affect the question of trade fixtures. A fixture, whether a trade fixture or any other kind, is, during the time it is so fixed land, but liable to be separated therefrom by divers operations of the law, or at the will of the tenant. But the mechanics lien must attach to it while it is land, and by virtue of its being land. If the lien attaches to it while it is still a fixture and so land, the special *fi. fa.* sells the building and the interest in the land of the owner of the building, and the purchaser under it can remove it, in the same manner as the owner could before the lien attached, by virtue of its being a trade fixture. But if the owner of the building remove it as a trade fixture before the lien attaches, the lumber merchant cannot fasten it on anybody else's land. He cannot attach his lien to the land because the building is not there, nor to the building because the land liable to the lien is not there. You cannot make land liable to the lien because you move a house on it, it must be built there.

These principles will be found illustrated by a reference to the history of the lien laws. The first act upon the subject I can find, was passed in Pennsylvania in 1803, and was confined in its operation to the city of Philadelphia, and provided that every dwelling-house or other building and the lot on which it stands, should be liable for the debts contracted by its owner for work and materials furnished. It was because of the increased value of the land in the hands of the owner by reason of the building, that the lien was given, and this is the principle that runs through all the lien laws since passed, whether in Pennsylvania or elsewhere.

Our act was passed in 1835, and was the same in effect as that of Pennsylvania, and, like it, applied only to particular places, and it so continued, making the lien on the land in the hands of the owner of the fee only. But it was found hard to make the owner of the fee liable for debts contracted by the tenants for years or for life, or otherwise, and the law was early modified in Pennsylvania. It remained in our state in its original form, being only extended in territorial area, until 1853, when the legislature reviewed the whole matter, and followed pretty much in the wake of Pennsylvania improvements, but gave us a more perfect system than that of Pennsylvania, except that there they proceed by equitable forms. But our legislature of 1853 introduced this great improvement upon our old law. Preserving the principle that the land should be liable to the lien, on account of the increased value given to it by the building, it yet subjects to the lien, only the estate the owner of the building had in the land. It does not subject estates of any other owner without his written consent, and thus does equity all around : but still preserves the first principle of the lien law, to subject to its provisions the estate of the owner of the building in the land, whether he is owner of the land in fee for life or for years, on account of the increased value, real or supposed, given to it by the building. Many of the other states have followed more or less closely in the wake of Pennsylvania, but all proceeding upon this fundamental idea, viz., to hold a lien on the estate of the owner of the building in the land, on account of the increased value given by the building to the land, and the natural injustice there is in the owner of the land appropriating to his use, without compensation, the toil and capital of others.

Thus we see why it is, that it was never the intention to attach the lien to mere personal property, and why it has never been so in fact. The whole object has been to prevent the owner of lands, whatever his estate in them, getting the labor and capital of others without compensation; and so

these lien laws everywhere, as in this state, do not attach to mere personal property.

Let us now proceed to apply these considerations to the case before the court.

Although the act uses the general term any building, yet the Supreme Court decided, in the case of *Babbitt* v. *Condon*, 3 *Dutcher* 154, that it does not cover every building, but only those buildings in which the owner of the building, or the one who has built it as owner, has some estate in the lands on which it was erected. This term any building must be confined to such buildings as are erected upon lands in which the owner of the building has some estate to be benefitted.

Here the owners of the building were the Dry Dock Company. They had an estate for years in the land on which the declaration avers it stands. The lot is thus described in the declaration: beginning on the easterly line of Green street, at the distance of eighty feet north from South Eighth street; and thence, northerly one hundred and fifty feet to South Seventh street; thence, easterly four hundred feet to Hudson street; thence, southerly one hundred and fifty feet; thence, four hundred feet to the beginning. The legal effect of the declaration is that this dry dock stands, and was erected on this lot thus described.

It would be a sufficient answer to this whole case to say, that the special verdict finds expressly, that this floating dock was neither built or erected on this lot so described, and is not now and never has been standing on it. It floats, indeed, in front of it sixteen feet distant, and that is the nearest it has ever been to being on it. It is said to be attached to this lot by some kind of contrivance, and to float alongside of it; but this no more makes it stand on this lot than it does the waters of the Hudson on which it floats.

But perhaps it may be said that we must intend the declaration to mean, that this floating dock stands on the land over which it floats, in front of and alongside of this lot described by metes and bounds.

In the first place, I do not think we can so construe the declaration. There is no averment that it stands over this land covered with water. This land covered with water is not described in the declaration as the land on which this floating dock stands, but as part of the property leased to the Dock Company, and is copied literally from the lease. But suppose we are wrong in this, and that the declaration had claimed that this dock stood upon the lot over which it floats, and described the lot by metes and bounds, yet there are many reasons why it is not subject to this lien, whether we consider it as being either on the lot described in the declaration, or on the lot under water above which it floats.

1. Was this kind of a building within the meaning of the lien law? It is evident that the legislature did not use the term building in its broadest signification. It did not mean ships, and never was so considered by anybody, and yet ships are built. It did not mean horse rakes or reaping machines. By the term building in this section, the legislature meant something in the nature of houses, as houses, mills, manufactories. They meant, if I may so speak, land animals, buildings attached to and becoming part of the dry land itself. They meant by it the definition given to it by Webster in his dictionary : "An edifice constructed for use or convenience, as a house, a church, a shop, &c."

2. In the next place, the act speaks of such buildings as are built and stand upon lots and curtilages. By the word " lot," the legislature evidently meant town or city lots, 25 by 100, and so on. The first act in Pennsylvania, in 1803, only included Philadelphia, and only used the word lot; the word curtilage only came in afterwards, when contemplating buildings more in the country. And by the term buildings on lots, in this said act, was only contemplated dwelling houses. But in the country not only houses were wanted, but out-houses, barns, stables, mills, &c., and so they in time added the word curtilage to that of lot, and by which was embraced all the buildings within the curtilage.

By buildings built upon curtilages, the legislature could

only mean buildings standing on dry land. It is evidently the farthest thing from the mind of the legislature, that when they speak of buildings built and standing on lots and curtilages, they meant buildings built to float upon tide waters. The word curtilage originally signified the land with the castle and out-houses, enclosed often with high stone walls, and where the old barons sometimes held their court in the open air, and which word we have corrupted into court-yard. But nothing could be more foreign to all ideas of a curtilage than a lot of land under tide waters, nor could anything be more foreign to the meaning of the term lot, as used in the statute, than a piece of ground under tide waters. It might become either a lot or a curtilage when reclaimed and raised above the water and made fast land, but until then it could only be known as water and not land at all. The whole earth itself is divided into the two great domains of land and water. The terms lot and curtilage belong, by all usage by everybody, to the land. This structure floats upon its great opposite, water.

3. The structure, to come within the lien law, must have been built and erected on the lot or curtilage sought to be affected by the lien.

Was this structure built or erected either on the lot described in the lien or on the land over which it floats? The special verdict finds expressly the contrary. It was built on a piece of land a thousand feet distant, and thence launched and floated where it now is. The lumber in question was all delivered on the lot where it was built, and there put into the building. That lot was the lot where this structure was built, and if a lien ever could attach it was on the lot where it was built and before it was launched; and being once launched, if any right of lien ever attached, it was dissolved. The right of lien would not float with it to any part of the world, where the winds or tides or human agency might carry it.

4. Does this structure stand on land within the meaning

of the lien law? This lien can only arise when the building stands on land whereon it was erected.

In the first place, it was not erected at all where it is now, but somewhere else. But suppose it had been erected where it now is, could it be said to stand on the land? Is not its condition as opposite to that as possible? Instead on land does it not float on water? It could no more stand on land than a house could float on water. The two kinds of buildings were intended, from their birth, to live and have their being on the opposite elements of land and water.

But that the legislature by the term buildings in the act, meant buildings on land in the nature of houses, is apparent upon almost every section in the act and its supplements. So apparent is this, that in one at least of the sections they use the term houses and also the term building, showing that they were treating them as if of synonymous meaning. Thus, in the ninth section the only plea the owner can put in to a declaration claiming a lien on the building, is that the said "house" is not liable for the debt.

Acts more or less similar to the one before us have been in force several years in some of the other states, but this is the first case I can find that a thing that floats upon tide waters equally at times under as above it, was a building erected and standing on land.

But it is next contended that if this building does not come under the 1st it does under the 5th section of the act. This provides " that any addition erected to a former building, or any fixed machinery or gearing or other fixtures for manufacturing purposes, shall be considered a building for the purposes of this act, but no building shall be subject to the provisions of this act for any debt contracted for repairs done thereto or alterations made therein." It is contended that this floating dock is a fixture for manufacturing purposes within the meaning of this section, and should be considered a building for the purposes of the act.

Our first answer to this is, suppose we do consider this floating dock a fixture, and therefore a building for the pur-

poses of the act, then it must have all the requisites which a building must have, to make it subject to the lien law. In the first place, it must have been built and erected on the land subject to be charged with the lien, which this was not. In the second place, it must have been built on a kind of lot which was in the mind of the legislature, to wit, a piece of land, and not a piece of water. In the third place, it must be erected on a piece of land in which the owner of the building has some estate, which here the Dock Company could not have had, as the land was under the tide waters of the Hudson. In the fourth place, it must have been erected on land, and not on water. In the fifth place, it being erected on tide waters, no one could have such a title in the waters on which it floats as that they, the waters, could be subject to the lien laws. In the sixth place, it must stand on land, and not float on water. If, therefore, this floating dock was a fixture within this section, and therefore to be considered a building, yet it would not be subject to the lien law, because if it were in fact a building, it has none of the requisites necessary to make it subject to the lien.

But has this floating dock any pretensions to a fixture for manufacturing purposes, within the meaning of this fifth section? A fixture must be either on the surface of the ground or above or below it, but cannot be off the land to be charged, as is the case. So far from being on the land charged, or above or under it, it floats in water twelve feet from it. Such a thing may be attached to the land, but cannot be a fixture in it. Nor can this thing be called a fixture to the lot over which it floats, any more, nor as much as a ship at anchor. There can be no such thing as fixtures in tide waters; there is only the right of passage.

But again, in what sense can this floating dock be a fixture? It may be a building of some kind or other, but how a fixture? Suppose we apply machinery powerful enough to lift it out of water and place it bodily on dry land, where the declaration says its stands, and look at it—one hundred and seventy-five feet long, eighty feet wide, seventy-four feet

four inches high. A fixture to what? It could not be to any other building, for there is none there. It could only be a fixture by resting on the earth with its huge corpus, fixed there by its own weight. But the act requires that it shall not only be a fixture, but a fixture for manufacturing purposes. The only manufacturing it was designed for was to float ships on, so as to repair their bottoms. How, if on land, could ships get in it, or what manufacturing purpose could it serve?

But again, there is another difficulty; the fixtures for manufacturing purposes intended in this fifth section, are fixtures put into an addition to a former building, or fixtures put in the former building. It is not all kinds of fixtures that the act embraces. It does not embrace fixtures for agricultural purposes, but only fixtures for manufacturing purposes which require buildings in the nature of houses. It obviously means only fixtures to buildings in which manufactures are carried on. The flume, in *Edwards* v. *Derrickson*, 4 *Dutcher* 39, was decided to be a fixture, not because it rested upon the earth, but because it was affixed to and in the mill. To what building is this floating dock affixed? The case shows it to move, whether it stands on land or water. If it stood on land it would be a great useless building, but a fixture to nothing in the sense of the statute.

There is only one case that I can find that appears to militate against these views, and that is the case of *Olmsted* v. *McNall*, 7 *Blackf.* 387. The statute of Indiana declared that lumber merchants should have a lien on any building for lumber furnished it, without giving any direct lien on the land. The building in this case was a floating stationary warehouse, attached to the bank of the river. All that the act further said was in its twelfth section, which provided that under a claim, the court should order the house and interest of the employer in the lot to be sold. It will be observed that their act is very different from ours, and leaves it somewhat in doubt, whether their legislature did not intend to cut loose from the fundamental principle of our lien

Coddington et al. v. Dry Dock Co.

laws not to give a lien, except by reason of the estate of the owner of the buildings in the land. But whether so or not, the reasoning of the court is entirely unsatisfactory to me, and I do not feel disposed at all to follow it.

It appears that that court, in coming to the conclusion they did, inadvertently overlooked the principle lying at the bottom of all the mechanics lien laws, from the first one prepared in Pennsylvania in 1803 to the present time, which was to give a lien, not because they intended to alter the law of personal estate as regards liens, but to give a lien on the building and land because of the value of the building going into and increasing, to that extent, the value of the estate of the owner of the building in the land.

The judgment below must be affirmed.

*For affirmance*—CORNELISON, ELMER, FORT, GREEN, CH., HAINES, VREDENBURGH, WHELPLEY, C. J., WALES.    8.

*For reversal*—COMBS, KENNEDY, VAN DYKE.    3.

Judgment of the Circuit Court affirmed.

CITED in *McIntosh* v. *Thurston*, 10 *C. E. Green* 247.