CARDINAL et al. v. UNITED STATES.

No. 9075.

Circuit Court of Appeals, Eighth Circuit.

May 1, 1931.

Will A. Blanchard, of Anoka, Minn., and Thomas E. Latimer, of Minneapolis, Minn., for appellants.

Lewis L. Drill, U. S. Atty., and Robert V. Rensch and O. A. Blanchard, Asst. U. S. Attys., all of St. Paul, Minn.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and MUNGER, District Judge.

VAN VALKENBURGH, Circuit Judge.

Appellant Adolphus Cardinal lives on a farm of three hundred and twenty acres situated sixteen miles north of St. Paul, Minn. Appellant Ray Cardinal is his son, and lives upon another farm of seventy-six acres. This latter tract also is the property of Adolphus Cardinal, and is situated one and one-half miles from the latter's home. Appellant Archie Cardinal, son of Adolphus Cardinal, twenty years old, lives with his father. Adolphus Cardinal had placed his son Ray on this seventy-six acre tract; it was known as the Ray Cardinal farm, and the father intended that ultimately it should become the property of his said son. Adolphus Cardinal, however, still retained both title and jus disponendi. He testifies that, about October 1, 1927, two men came to his home place, said they were trappers and wished to lease an acre of his land in the vicinity of a knoll or hill on the Ray Cardinal farm near Otter Lake, upon which to build a shack for trapping, hunting, and fishing. As a result of these negotiations he produced a lease dated November 1, 1927, running to one A. Johnson, as lessee, for a period of five years at an annual rental of $25, and testifies that two installments of rental had been paid him prior to January 24, 1929.

It appears that Ray Cardinal came upon the seventy-six acre tract October 27, 1927. With the financial assistance of his father he built on the place a four-room house and a barn. He says that in the fall of 1928 two men came to his place, said they were the ones who had rented the land from his father, and asked permission to prepare in his barn a place in which they could sleep. They agreed to furnish the material and build the room themselves. Permission was granted. The room was built and meagerly furnished in November, 1928.

January 24, 1929, in the midst of a blizzard, prohibition officers visited the Ray Cardinal farm. They found tracks leading from the barn to the knoll or hill, at about which point the hunting shack was supposed to be built. Instead of a shack the officers discovered a cave, eighty feet long by forty feet wide, about ten feet high at the entrance, and twenty feet high at the opposite end. At the rear was an additional space containing about eighty square feet. This cave was entered by a trapdoor about three feet square situated on the side of the hill, and, at the time, almost entirely concealed by the covering of snow. The cave contained a very elaborate and extensive distilling plant, not at

that time in operation; but the officers found there five barrels, containing approximately two hundred and fifty gallons of high-proof "moonshine" whiskey. From the cave tracks of a man and a dog led back to the house of Ray Cardinal, distant about one thousand feet. The officers proceeded from the cave to this house and placed Ray Cardinal under arrest. One of the officers then returned to White Bear, Minn., for assistance. Officer James Harney remained. At about 2 o'clock in the afternoon Archie Cardinal drove up with a sleigh in which were three men besides himself. He says he came to get a load of stumps from his brother's farm. He claims that he had picked up the three men, strangers, who had asked him for a ride. Two of these three men were identified as Ben Holtzshutter and Frank Giroux. The third man is known only as John Doe. He and Giroux speedily made their escape, and are still fugitives. Archie Cardinal admits that in October, 1928, he hauled a load of corn sugar from St. Paul to the Ray Cardinal farm, unloaded it in the pasture in which the cave was situated, and behind a woodpile at a distance of one hundred or one hundred and fifty feet from the barn; that he did this at the instance of Holtzshutter, who paid him $6 for the hauling. Ray Cardinal subsequently admitted that Holtzshutter was one of the men who came to him about renting the room in his barn. Adolphus Cardinal also identified Holtzshutter as the man who came with Johnson to lease ground for the hunting shack. Government officers testified that Archie Cardinal had stated to them that he had assisted in making the excavation for the cave, and that the team and scraper of Ray Cardinal had been used in this work. This was denied by Archie and Ray Cardinal at the trial of this case. All three appellants stoutly denied any knowledge of the existence of the still and protested their innocence of participation or interest in the unlawful enterprise.

March 2, 1929, an indictment was returned in the District Court for the District of Minnesota, charging that, January 24, 1929, in the cave heretofore described, Archie Cardinal, Ben Holtzshutter, Adolphus Cardinal, Ray Cardinal, Frank Giroux, and one John Doe (specifically described) "did feloniously have in their possession and under their control a certain still and distilling apparatus set up, used, and intended for use in the manufacture of distilled spirits, to-wit, whisky, which said still and distilling apparatus was not and had not been registered with the

Collector of Internal Revenue for the District of Minnesota," etc. The three appellants were the only ones in custody when the case was called, and they alone were tried. Verdict of guilty resulted. The assigned errors relied upon deal entirely with the charge of the court.

This prosecution is brought under the provisions of section 281, title 26, USCA, the part material to the question now before us reading as follows: "Stills and distilling apparatus shall be registered immediately upon their being set up. Every still or distilling apparatus not so registered, together with all personal property in the possession or custody, or under the control of such person, and found in the building, or in any yard or inclosure connected with the building in which the same may be set up, shall be forfeited. And every person having in his possession or custody, or under his control, any still or distilling apparatus set up which is not so registered, shall pay a penalty of $500, and shall be fined not less than $100, nor more than $1,000, and imprisoned for not less than one month, nor more than two years."

The court in its charge practically narrowed the case against appellants in the following language: "* * * The evidence does not seem to disclose that they were actively engaged in the operation of the still, and did not have it in their possession or under their control in that sense, and you were told that if they are guilty it is because they were aiding and abetting; that is, they were assisting in some way those who were really guilty in a primary way. They were aiding and assisting them to have this possession and this control."

The aiding and abetting upon which the court based its instructions to the jury consisted (a) in renting the site for the still with knowledge that it was to be used for that purpose, or (b), if that knowledge came afterwards, in consenting to and aiding in the continued unlawful possession. The statute defining aiders and abettors (section 550, title 18, USCA) as principals is very broad in its terms. It reads: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

 Throughout the submission of this case it was accepted and, in substance, stated that the defendants were not in actual physical possession and control of the still and distilling apparatus. The potential guilt of appellants was based upon the theory that they were aiders and abettors in the unlawful possession and control of others. The suggestion was made that this offense, demanding actual possession and control and duty to register, excludes the element of aiding and abetting as denounced by the statute. We do not think the application of the act is so limited. While it is at least doubtful whether the offense of concealing assets from a trustee in bankruptcy can be committed by another than the bankrupt, or one who has been discharged as such (United States v. Rabinowish, 238 U. S. 78, 86, 35 S. Ct. 682, 59 L. Ed. 1211), nevertheless it has been consistently held that all who aid and abet in such concealment are liable as principals. Barron v. United States (C. C. A. 1) 5 F.(2d) 799; Reinstein et al. v. United States (C. C. A. 2) 282 F. 214.

In Rosencranz v. United States (C. C. A. 9) 155 F. 38, 43, it is held that "a man who rents a house to be kept as a disorderly house, and which is so kept with his knowledge, especially where he derives a profit from that mode of using the property, may well be called the keeper of the house and be punished as such," following Lowenstein v. People, 54 Barb. (N. Y.) 299, and People v. Erwin, 4 Denio (N. Y.) 129. The decision is based upon the general proposition that "all who procure, counsel, aid, or abet the commission of the crime are principals." Appellants are persons competent to commit the offense charged, and no reason appears why they may not aid and abet such unlawful acts of others. Counsel, however, urge the well-known rule that "knowledge without some evidence of participation is not enough. Circumstances merely arousing suspicion of guilt are insufficient." Tingle v. United States (C. C. A. 8) 38 F.(2d) 573, 575; Turinetti v. United States (C. C. A. 8) 2 F.(2d) 15; United States v. Newton (D. C.) 52 F. 275, 289; United States v. McClarty (D. C.) 191 F. 518, 522.

A number of conspiracy cases have been cited, and others examined are instructive upon the point under consideration. In Turcott v. United States (C. C. A. 7) 21 F.(2d) 829, the general rule is stated that active participation in an alleged conspiracy is necessary. Mere knowledge of the illegal acts of others is not enough. Liberato v. United States (C. C. A. 9) 13 F.(2d) 564, and Costal et al. v. United States (C. C. A. 6) 13 F.(2d) 843, are not helpful, because, in those cases, active participation is shown. McDaniel et al. v. United States (C. C. A. 5) 24

F.(2d) 303, 305, holds that knowledge that others are in a conspiracy to violate the law and full sympathy with and approval of the object of that conspiracy without more would not make one a party. In Brady v. United States (C. C. A. 7) 41 F.(2d) 449, appellant was charged with one De Keyzer of conspiracy to violate the National Prohibition Act. Brady, the owner of a former saloon property, vacant some years, leased the premises to De Keyzer, who was later found guilty of possession and sale, and the maintenance of a nuisance. The court found that Brady must have been "well aware of the violations of law on his property and of the unlawful character of the business there being transacted." It was held that, for this reason, a jury question was presented as to both defendants. The holding of the Fourth Circuit in Di Bonaventura et al. v. United States (C. C. A.) 15 F.(2d) 494, 495, is especially interesting in its application to the case at bar, and demands liberal quotation for the better understanding of that application: "A landlord who knowingly allows liquor to be manufactured on his premises in violation of law is guilty of maintaining a nuisance in contravention of section 21 of title 2 of the National Prohibition Act, 41 Stat. 314 (Comp. St. § 10138½jj [27 USCA § 33]). And the failure of the landlord to stop the unlawful manufacture after knowledge that his premises are being used for that purpose is evidence which the jury may consider on the question of aiding and abetting, and which, under some circumstances, may justify his conviction of manufacturing in violation of the statute. Reynolds v. U. S. (C. C. A. 6th) 282 F. 256; Steir v. U. S. (C. C. A. 1st) 2 F.(2d) 149. And it is true also that, where one with knowledge of the existence of a conspiracy aids the conspirators in the carrying out of their unlawful design, he is equally guilty with them. Simpson v. U. S. (C. C. A. 4th) 11 F.(2d) 591; Rudner v. U. S. (C. C. A. 6th) 281 F. 516. But a landlord is not necessarily guilty of conspiracy to violate the Prohibition Act merely because he has knowledge that liquor is being manufactured on his premises and does not stop it."

This holding was based upon the consideration that the crime of conspiracy is distinct from that which is the object of conspiracy, as appears from the language which follows: "The learned trial judge evidently had in mind the rule that one who, with knowledge of the existence of a conspiracy, aids in carrying out its design is guilty with the other conspirators; but the trouble is that the portions of the charge complained of authorized a conviction, not upon a finding that a conspiracy existed, and that the landlord, with knowledge of its existence, aided the conspirators in carrying out its purpose, but upon a finding of no more than that liquor was being manufactured on his premises, and that he knew what was going on and did not stop it. This might have justified a conviction of maintaining a nuisance or of unlawful manufacture, but not a conviction of the felony of conspiracy, in the absence of any finding that the landlord entered into a combination or agreement to violate the law, or that he, with knowledge that a conspiracy existed, not merely that the law was being violated, aided the conspirators in carrying out their unlawful design."

In Reynolds v. United States (C. C. A. 6) 282 F. 256, 257, it was held that, although appellant's status was that of a mere landlord, yet, if she had knowledge that her tenant was carrying on the distilling charged, she would herself be guilty of manufacture. Concerning this aspect of the charge, the Circuit Court of Appeals said: "We do not doubt that the relation of a landlord to manufacturing carried on by a tenant, and after the landlord has knowledge of the tenant's enterprise, may be such as to constitute aiding and abetting, and accordingly to make the landlord a principal, under Criminal Code, § 332 (Comp. St. § 10506 [18 USCA § 550]), and liable to conviction upon the indictment for the principal offense. It is upon this view of the matter that the charge is to be justified, if at all. However, we think the inference of aiding and abetting is rather permissive than imperative. A landlord must not only have knowledge, but, after sufficiently complete notice or knowledge, a reasonable time must have elapsed for him to reach his tenant and insist upon either vacation of the premises or an absolute cessation of the illicit business. Indeed, the longer mere nonexercise of a power to prevent would not necessarily be aiding and abetting; it would be one of the elements supporting a composite inference. U. S. v. Gooding, 12 Wheat. 460, 475, 6 L. Ed. 693; Words and Phrases, First, Second and Third Series, 'Aiding and Abetting.' The extent of that reasonable time and the character of the noninterference are influenced by all the conditions of the particular case, and by the charge these additional elements were, in effect, excluded from the jury's consideration."

We see no reason why the offense of aiding and abetting may not be committed in

connection with the unlawful possession, custody, or control of an unregistered still, as well as in connection with the illicit manufacture of liquor or the maintenance of a nuisance. It is further our opinion that one cannot knowingly permit his premises to be used for an unlawful purpose, thereby contributing to the success of the enterprise in a very substantial way, without becoming a party thereto, unless, within a reasonable time after becoming aware of the unlawful use, dependent upon the circumstances of the individual case, he takes steps reasonably calculated to terminate that unlawful use. In the instant case, as in the Reynolds Case, supra, this important qualification was not sharply submitted to the consideration of the jury.

■ As to some of the appellants, the evidence would tend to show participation in the enterprise in jointly exercising possession, custody, and control of the unregistered distilling plant. It was located upon the farm occupied by ·Ray Cardinal. He furnished sleeping quarters for those who rented this parcel from his father. There was testimony that his team was employed in the excavation, and that he warned his brother, and those who came with him on the date of the raid, that they had better "get out" because federal officers had raided the premises. His knowledge of the existence of the plant was a matter of legitimate inference. Archie Cardinal also might well have been found to be a principal. He appeared with the others in a blizzard on the day of the raid, and made the rather flimsy pretext that he had come for a load of stumps. There was testimony that he had worked upon the excavation of the cave, and he admits hauling a load of corn sugar, and unloading it behind a woodpile on the premises at the instance of Holtzshutter.

Adolphus Cardinal, the father, owned the land and made the lease of the ground upon or under which the plant was installed. No other connection with the enterprise is shown. That his sons might have informed him of the true situation amounts to little more than suspicion of guilt, which is not enough to warrant conviction. He lived one and one-half miles from the location of the · still; and testifies that he had been unable to walk much and had never visited the place since the pit was dug. But the main ground of participation, submitted by the court, was that of aiding and abetting by permitting the premises to be used with knowledge of the unlawful purpose. This matter received especial emphasis and was sharply defined. At one time, during the deliberation of the jury, the court said:

"The question is whether or not these defendants, or any of them, were so intimately connected with the maintenance of the still at that place and with the possession of it, through the furnishing or providing the place, that they knowingly aided and abetted?

"Juror: You spoke about knowing that this still existed. I was just going to ask if it would make any difference whether that knowledge came to me before the still was in operation or afterward? Would the same responsibility rest with me if I came to the knowledge after the still had been established, as if I had known it in advance?

"The Court: In respect to that, if the knowledge came afterward, and the conduct of the man was such that he consented to and aided in the unlawful possession, it would be equally binding as if he knew of it in advance, as a contemplated proposition, otherwise not."

Repeated statements by the court advised the jurors that they would be justified in returning a verdict of guilty against the defendants if they had "knowledge that the land under their control was being unlawfully used for the purpose in question, with their consent and acquiescence." Obviously mere consent and acquiescence would not suffice in any case unless that specific defendant had the power and the duty to terminate the tenancy. Neither Ray Cardinal nor Archie Cardinal had this power. A conviction on this ground could not be allowed to stand as to them. As stated above, the evidence against Adolphus Cardinal, the owner, is of doubtful substance.

■ Another serious criticism is made to the court's submission. It is that the charge of the court was argumentative, emphasizing testimony favorable to the government and discrediting that of the defendants. We find it necessary to quote somewhat at length from the charge. The following paragraphs have to do with the claim of defendants that they had no knowledge of the existence of the still:

"You know what the situation was at the place in question. The young man, Ray Cardinal, had lived on the place for a year and a few months. This cavern, or dug-out, where the still was, was somewhere from four hundred to a thousand feet from his residence; that is, it was somewhere from one

block to two blocks and a half—the ordinary city block, from his residence, and evidently had been there for some time. The excavation was such that at least one thousand cubic yards of dirt had to be removed, perhaps considerably more than that. You know what he claims in connection therewith—that he had never seen it, did not know it was there. He has a right to say that, if it is true; if it is not true, he has not any right to say it.

"You know that the father claims to have rented the place, in the fall of 1927, and that although this large still was found there, he has never been there since, so far as we know. He has a right to keep away from it, and to tell you the truth in reference thereto; he has no right to tell anything else.

"The fact that the young man did not know of it, or claims that he did not know of it, the fact that the older man claims he did not know of it, and did not go to see it, may have, or may not have some considerable bearing with you in determining whether they or either of them are telling the truth in connection with such a matter. What is the reasonableness, or the unreasonableness of the story? Did they, or either of them, know well enough that something of that kind was going on there, and know well enough that they were furnishing a place for it, and kept away intentionally, if they kept away at all? Or, is it a fact that, in entire innocence, they had no knowledge whatever that such a still was there? * * *

"Without speaking definitely about this case, you must understand that in many of these cases that are for trial, and even at this term of court, let me say—I am not speaking particularly of this case, but in the trial of lawsuits, the effort is constantly being made to see just how gullible a jury is, just how much they will swallow, just how simple minded they are; that is sometimes on the one side, and sometimes on the other, that the effort is being made. You must be shrewd and far sighted, and see to it that nobody shall be encouraged to try to impose upon you, or make you believe stories which sensible people would reject, wherever the attempt is made, whether by the government people in a case like this, or in a civil action by the plaintiff, or in either kind of an action, by the defendant, or his witnesses. * * *

"If these men or any of them were not connected in any way with this still, you would know well enough what your duty must be under the circumstances; it would be to find the defendants * * * and each of them not guilty. Now, then, by rea-

son of their propinquity to this still, by reason of the opportunity which they had for knowing that of which they say they never availed themselves, by reason of the other facts which the Court will not detail for you, —if you are satisfied that they or any of them are guilty, it would then of course, be your duty to convict."

The jury retired at 4:15 p. m. March 15, 1929. At 9 o'clock the next morning the jury appeared and the following colloquy took place:

"The Court: Ladies and gentlemen, have you elected a foreman?

"Mrs. Kellington: Yes, your Honor.

"The Court: You are the foreman, are you Mrs. Kellington?

"Mrs. Kellington: Yes.

"The Court: There is nothing startling at all in connection with asking you to come in this morning at this time. I assume, of course, that you have not agreed?

"Mrs. Kellington: No, we have not."

The court then proceeded to instruct the jury further. Among other things, it said: "If there was someone who was knowingly making it more easily possible for these people to maintain and control that still, and this assistance was of a substantial character, the person so rendering such assistance is equally guilty with those that were in the cave and operating or maintaining or controlling the still."

At 2:15 p. m. of the same day, March 16th, the jury returned to the court.

"The Court: Mr. Foreman, you have indicated that you want further assistance?

"The Foreman: No, we cannot come to any agreement.

"The Court: Well, that seems to be the situation, you think?

"The Foreman: Yes."

The court then inquired what points were troubling them, and a juror said:

"There seems to be some question among the twelve in regard to the part of the defendants in this case.

"The Court: Yes. Well, so far as we know, the part, if any, which they had, or which any of them had, was in connection with the furnishing or providing a place where this still might be operated, and where it might be possessed and controlled by, perhaps, somebody else. As I indicated to you this morning, perhaps it was Mr. Holschutter, or somebody else. Of course, Mr. Hol-

schutter had no right to be on the ground at all, unless by consent of those who had the general control of it. Now, those who had such general control come to you and say that they knew nothing about it; they did not know anything about any such still being there at all. The outstanding fact, however, is that it was a very large affair. You know the distance that it was from the house, and you know whether it is likely or is not likely that such a thing was going on there without people all around knowing about it. They say they did not know of it. Well, give that such weight as you think it is fairly entitled to receive.

"Then, there are the other certain matters, including the fact that the men were living in the barn for a time,—some men, anyway; the proximity of the place to the house; whether it is likely that it was known of by the owners, or those having charge of the premises.

"Maybe the defendants are telling the truth, and maybe they are not. Of course, there might be a large still in my backyard, and I might say, 'I don't know anything about it,' but you would not believe me at all. You would say, 'You are just saying that because you think that will help you most.' Now, are these people doing the same thing, or are they tellin the truth when they say they did not know anything about it, their part in it, if they had any part, and the Court does not indicate that at all, leaving it to you; your good sense is called for; your judgment is being drafted. The part which they had in it, if any, was in providing the place, or furnishing the place where these operations might be carried on. There are various considerations on one hand, which are more or less persuasive. Now, you might say they are very persuasive, or some of you may think they are not, which would lead to the conclusion that they did not know what was going on, or that when they now say they did not, they are not telling us the truth.

"On the other hand, you have seen them, and they have said that they did not know about it. Maybe that is the truth. I am saying that that is possibly the truth. That is for you to say; it is not for the Court to say; it is for you to say. Do you say that those people were living there and had control of

that place, and that they were going and coming, and had no information of any still there? Or, do you say that they must have had the knowledge; that they must have known that they were providing such a place?"

At 5:25 p. m. of March 16th, the jury returned again to the court room.

"The Court: Mr. Foreman, you have not agreed, and you have come into court, as I understand, to ask for further assistance have you not?

"Foreman: No, we have all the instructions we want, but we cannot seem to agree."

Thereupon, the court, inviting questions from the jury, entered upon a rather extended charge, covering, in questions and answers, more than five pages of the record. At none of these supplemental charges were counsel for defendants present, but in all of them exceptions were allowed to each statement of the court.

As said by this court in Rudd v. United States, 173 F. 912, 914: "We do not mean to impair in any degree the right of a trial court in both civil and criminal cases to comment upon the facts, to express its opinion upon them, and to sum up the evidence, for that is one of the most valuable features of the practice in the courts of the United States. A judge should not be a mere automatic oracle of the law, but a living participant in the trial, and so far as the limitations of his position permit should see that justice is done. But his comments upon the facts should be judicial and dispassionate, and so carefully guarded that the jurors, who are the triers of them, may be left free to exercise their independent judgment."

Undoubtedly, taking his charge as a whole, the learned trial judge, actuated by the best of his motives, endeavored to hold the scales of justice level between government and defendants; but we cannot escape the conviction that, in his zeal to avoid a mistrial, particularly by his supplemental charges, repeated at short intervals, generally without request from the jury, he unconsciously exercised undue pressure in securing a verdict. Our conclusion is, for reasons appearing in this opinion, that the judgment below should be set aside and the case remanded for a new trial. It is so ordered.