UNITED STATES of America

v.

Roger LaBERGE, Thomas Taylor and Otis Taylor.

Cr. No. 27325.

United States District Court
D. Maryland.

April 27, 1967.

Roger C. Duncan, Asst. U. S. Atty., for Government.

Arnold M. Weiner, Baltimore, Md., for defendant Roger LaBerge.

Martin A. Ferris, III, Baltimore, Md., for defendants Thomas Taylor and Otis Taylor.

FRANK A. KAUFMAN, District Judge.

On each day beginning October 16, 1965 and ending October 24, 1965, one or more agents of the Alcohol and Tobacco Tax Division of the Internal Revenue Service observed activities on a farm, approximately sixty-six acres in size, located in a rural area in Caroline County, Maryland. On October 18, 1965, one of the agents, Naylor, made an affidavit for a search warrant before the United States Commissioner at Aberdeen, Maryland, affying that he had received information from the Delaware State police that two of the defendants, the brothers Taylor, employees of the General Motors plant in Wilmington, Delaware, and residents of New Jersey, were engaged in selling moonshine whiskey; that on October 16, 1965 he (Naylor) had seen the Taylors enter the above-described Caroline County property; and that from a point not within "the curtilage" of that farm property, he had noted what appeared to be "part of a still and had detected the unmistakable odor of whiskey mash." Agent Naylor's affidavit of October 18, 1965, also states that on October 17, 1965, "while well off the curtilage" he observed distilling apparatus and that he had again smelled the odor of mash. The Commissioner issued the search warrant on October 18, 1965. After keeping the premises under surveillance for several hours on October 24, 1965, Agent Naylor and other Agents of the Alcohol Tobacco and Tax Unit entered that day upon and searched the farm, found in a shed on the farm whiskey mash and approximately fifty gallons of non-tax paid spirits, and arrested the three defendants (the two Taylors and LaBerge) who were on the property at that time with two friends of LaBerge and the wives and children of the Taylor brothers.

LaBerge, the owner of the property, resided in Delaware with his family on a 17-acre farm situate about twenty-five miles from the Caroline County property. LaBerge was employed in a full-time job at the General Motors plant in Wilmington. He farmed the Delaware property, and to a limited extent the Maryland property, in his spare time. He purchased the Maryland farm in March 1965. During the summer of 1965, LaBerge planted some grain, and did some fertilizing, on his Caroline County farm.

By September 1965 LaBerge had become somewhat friendly with the Taylors, both of whom also worked at the GM plant in Wilmington. One or both of the Taylors told LaBerge that one or both of them operated a vending machine service business and needed a place at which to repair and service vending machines. LaBerge told the Taylors that he required assistance in caring for the animals on LaBerge's Maryland property and in the upkeep of those premises, because LaBerge's caretaker who had lived in the house on the Caroline County property, had departed about September 11, 1965. In September or October 1965, LaBerge rented to one or both of the Taylors a portion of the shed on LaBerge's Maryland farm for $5.00 or $10.00 per month plus the undertaking of one or both of the Taylors to keep the place clean, and to care for certain livestock on the Maryland property, the livestock being five goats owned by LaBerge, one or two hogs owned jointly by LaBerge and one of his Delaware neighbors, and a pony belonging to that Delaware neighbor. The Taylors also undertook to aid in the upkeep of the Maryland farm.

On the Maryland farm there is, facing a public road which runs along the front

of the property, a one-story frame building, a structure similar to at least one other nearby building. That latter building was in use as a residence in October 1965.

The house on LaBerge's Maryland property had electric service, but possessed no plumbing facilities. In October 1965, what furniture there was in the house was in poor condition, and the structure was generally in a rather bad state of maintenance. Nevertheless, it was a house which had been lived in as late as September 1965 by LaBerge's caretaker. Apparently, in October, 1965, it had not been permanently abandoned as an abode, at least for a caretaker.

To the rear of the house was an area covered with short grass which, while not a true lawn, was an ungroomed yard. At the back of the yard, approximately one hundred and ninety feet from the house, was a shed. Behind the shed was an area wooded in part and in part heavily overgrown with high weeds and some bramble. Leading to the shed and running perpendicularly from the public road was a dirt road. The shed was about fifty feet long and was divided into three parts. The section of the shed closest to the dirt road was fully enclosed by three outside walls and was separated from the middle part by bales of hay running up to, or close to, the ceiling of the shed. There was hay in the middle section and there were animals in the far right part of the shed (facing the shed from the dirt road). Both the middle and the right-hand sections of the shed were partially open on the front side (again facing the shed from the road).

It was in the far left enclosed part of the shed that the agents found a 60-gallon still in tandem with two 55-gallon wood stills, 1004 gallons of cornmeal and raisin mash, two boxes of raisins, 55 ½ gallons of non-tax paid whiskey (no stamps upon them), various tanks, tools, wood fermenter barrels, propane hand torches, jugs, 148 pounds of sugar, 3 pounds of malt extract, yeast, rye grain, etc. Thomas Taylor, found by the federal agents with his wife in the left section (facing from the front) of the shed on October 24, 1965, engaged in making whiskey, promptly admitted that he and his brother Otis had been and were engaged in making spirits illegally. Otis Taylor, who was found by the Agents and his wife and the children of both Taylors in and near the two Taylor automobiles parked in front of the shed, similarly confessed. Both Taylors stated to the Agents that they were engaged in the moonshine whiskey operation, and both denied that LaBerge had any knowledge of that operation. Both Taylors were fully advised of their constitutional rights before being interrogated and before they made any statements.

The Taylors, LaBerge and La-Berge's two Delaware neighbors (one of whom aided him regularly in the operation of the Maryland farm, was the joint owner of the hogs and the owner of the pony, and both of whom were on the property at the time of the raid on October 24th) stated initially to the Agents and have since maintained that LaBerge was not involved and did not know of the whiskey operation. LaBerge and his neighbor who was the joint owner of the hogs took the witness stand. Each denied any knowledge of the existence of the still or the whiskey operation. They stated (and the testimony of the Agents somewhat corroborated) that they had come to the Maryland farm on October 24th to shovel hay and to load a tractor on a pickup truck and transport it to LaBerge's home in Delaware. One Agent testified that he saw La-Berge at the back (and only) door of the "still" portion of the shed on October 24th before the raid. The extent to which LaBerge peered inside and what he saw is not clear. He testified he did not see anything but barrels. The testimony of the Agents shows that there was a smell of whiskey easily detectable for some distance from the shed by one or more of the Agents. But there were also smells of open garbage (obtained regularly by or for LaBerge from a nearby

Delaware restaurant as feed for the hogs) and also of wet hay and of the animals themselves. I cannot find beyond a reasonable doubt that LaBerge knew of the illegal whiskey operation conducted on his property by the Taylor brothers; nor that if he discovered the same on October 24th, he had the opportunity before the raid on that day to request the Taylors to cease their unlawful activities. Cardinal v. United States, 50 F.2d 166, 169, 170 (8th Cir. 1931); Reynolds v. United States, 282 F. 256, 257 (6th Cir. 1922). There was evidence that LaBerge and the joint owner of the hogs had each visited the Maryland farm on one or more occasions after the Taylors began to use the one section of the shed, but there is no evidence that either of them went into the whiskey still section of the shed after the Taylors rented it. Numerous fingerprints of both Taylors were found on objects in that section of the shed, but none of LaBerge or, so far as the record discloses, of the joint owner of the hogs or of the other Delaware neighbor of LaBerge who was with him on the Caroline County farm on October 24, 1965. I therefore find the defendant LaBerge not guilty under each and all of the four counts of the indictment.

■ I find each of the defendants Thomas and Otis Taylor guilty of the offenses charged in all four counts of the indictment.

Count one charges unlawful possession and custody of a still and distillery apparatus, which was not registered with the Secretary of the Treasury or his delegates as required by 26 U.S.C. §§ 5179 and 5601(a) (1). Count two charges the defendants with failure to give bond as required by 26 U.S.C. § 5173(a) before commencing business as a distiller. Count three charges the

unlawful making of distilled spirits under 26 U.S.C. § 5601(a) (7). Count four charges unlawful possession of containers of distilled spirits without stamps affixed evidencing compliance with 26 U.S.C. § 5604(a) (1). All four counts charge aiding and abetting under 18 U.S.C. § 2.

No direct evidence of lack of registration or lack of bonding was produced. The Government contends that there was absence of a sign as prescribed by 26 U.S.C. § 5180 and 26 C.F.R. § 201.235; and that therefore the Government has affirmatively shown lack of registration (count one), lack of bond (count two), and illegal manufacture (count three), since registration, bonding and manufacture could not be permitted without compliance with the sign requirements. However, it would appear from the statute and the regulations that the whiskey manufacturer has the responsibility of posting a sign. It would therefore appear possible that a person could comply with the registration and bonding requirements, and inadvertently or otherwise fail to comply with the sign requisites. Thus, the Government's contention in this regard would not seem sound.

■ There is, however, a completely independent reason for finding the Taylors guilty beyond a reasonable doubt under counts one, two and three. Under 26 U.S.C. § 5601(a) (6) the distilling of spirits "in any dwelling house, or in any shed, yard, or inclosure connected with such dwelling house" is forbidden.[1] While a structure no longer used as a residence may not be a "dwelling house" within the meaning of 26 U.S.C. § 5601 (a) (6) [see United States v. Potts, 297 F.2d 68, 69 (6th Cir. 1961); Chapman v. United States, 272 F.2d 70, 72 (5th Cir. 1959)], the structure here was

1. Pursuant to 26 U.S.C. §§ 5178(a) (1) (C) and 5601(a) (6) the Secretary of the Treasury has the authority, under a grandfather clause, to permit certain whiskey operations in dwelling houses to continue. The grandfather clause, however, relates to a period dating from or

earlier than July 1, 1959. It is clear from the evidence in this case that the Taylors' operation on LaBerge's Maryland farm commenced in 1965. Therefore the grandfather provision has no possible application to this case.

rather clearly a dwelling in October 1965 in view of its recent use by LaBerge's caretaker. The shed was in "an inclosure connected to the dwelling." Since the still could not have been permitted to operate under 26 U.S.C. § 5601(a) (6), it is clear that the premises were not registered in accordance with 26 U.S.C. § 5179 (count one), bonded under 26 U.S.C. § 5173(a) (count two), or operated in accordance with 26 U.S.C. § 5601(a) (7) (count three). Unlawful distillation in a dwelling house "is enough to give rise to an inference of lack of registration and failure to give bond which the defendant must overcome by proof." Rossi v. United States, 289 U.S. 89, 91, 53 S.Ct. 532, 533, 77 L.Ed. 1051 (1933).[2]

█ Insofar as count four is concerned, the record clearly establishes that the containers seized by the Agents and admitted as exhibits into evidence during the trial did not have revenue stamps affixed to them as required by 26 U.S.C. § 5604(a) (1).

I therefore find beyond a reasonable doubt that the brothers Taylor are guilty as charged under all four counts of the indictment.

█ [1] The case was tried before the Court without a jury. Prior to the trial there were several hearings on the motion of all three defendants to suppress the evidence seized on the Maryland property by the federal agents on October 24, 1965.[3] The final hearing on that motion was held, by agreement of counsel for all parties, at the same time as the trial itself was held. Defendants' motion to suppress is based upon the argument that Agent Naylor's af-

fidavit which led to the issuance of the search warrant was inadequate because, while it showed probable cause of a moonshining operation, it contained no facts tending to show a violation of any federal statute (i. e., any facts concerning lack of registration, bond and the like). Cf. United States v. Joseph, 174 F.Supp. 539 (E.D.Pa.1959), aff'd 278 F.2d 504 (3rd Cir. 1960), in which the affidavit stated the Agent had personally examined the Internal Revenue Service records to determine if wagering taxes had been paid. Defendants contend the search warrant is thus defective, citing United States v. Office No. 508 Ricou-Brewster Bldg., 119 F.Supp. 24, 26 (W.D.La.1954); and Tripodi v. Morgenthau, 213 F.Supp. 735, 738 (S.D. N.Y.1962). In those cases the affidavits of federal agents, on the basis of which search warrants were issued, were held insufficient as disclosing no probable cause to believe that a federal offense had been committed. In United States v. Parham, 17 F.R.D. 301 (E.D. Mich.1955), the Court endorsed but distinguished (at pp. 302–303) the rule in the Ricou-Brewster case stating that the agent's affidavit, containing the statement that he "detected the odor of fermenting mash fit for distillation emanating from the premises * * * described in the affidavit as a dwelling house," was sufficient to sustain the adequacy of the affidavit; that is, that probable cause of a federal crime (violation of 26 U.S.C. § 5601(a) (6)) was set forth in the affidavit. In the instant case Agent Naylor's affidavit of October 18, 1965, states that he observed barrels and "what appeared part of a still" and "detected the unmistakable

---

2. The fact that the illegal operation took place in "an inclosure connected to the dwelling" is relevant in connection with counts one, two and three in this case even though no part of the indictment is brought under 26 U.S.C. § 5601(a) (6).

3. If the motion to suppress were granted, the Court would not find beyond a reasonable doubt that there was a failure to affix stamps within the meaning of 26 U.S.C. § 5604(a) (1). Seemingly, however, sup-

pression of evidence as requested by the defendants would not remove from the case evidence upon which this Court could find, beyond a reasonable doubt, violations of law as alleged in counts one, two and three. Because of the ruling set forth in this opinion denying the defendants' motion to suppress, it is not necessary to reach this question in connection with the findings which are made herein, with regard to counts one, two and three.

odor of whiskey mash emanating therefrom" within the "curtilage." A curtilage is an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with the dwelling. Marullo v. United States, 328 F.2d 361, 363 (5th Cir. 1964); United States v. Potts, supra, 297 F.2d at 69; United States v. Vlahos, 19 F.Supp. 166, 169 (D.Ore.1937); Coddington v. Hudson County Dry Dock & Wet·Dock Co., 31 N.J.L. 477, 485 (1863); People v. Taylor, 2 Mich. 250 (1851); State v. Shaw, 31 Me. 523 (1850); 25 C.J.S. Curtilage pp. 81–85 (1966); 79 C.J.S. Searches and Seizures § 13 (1952); Black's Law Dictionary 460 (4th ed. 1951); 1 Bouv.Law Dict. Rawle's Third Revision, p. 741 (8th ed. 1914). In this case the dwelling and the shed, and the area between them, were all within a semi-improved type of area. That area would seem clearly to constitute a curtilage.[4] Agent Naylor's references to the curtilage seem clearly to disclose probable cause of violation of 26 U.S.C. § 5601(a) (6).[5]

■ For the reasons above stated this Court holds the search warrant was properly issued and that the motion to suppress should be denied. However, even if the Court were of the view (which it is not) that the search and seizure took place without the curtilage, either on the ground that the front structure was not a dwelling and therefore the area surrounding it was not a curtilage, or on the ground that the shed was not within the curtilage surrounding the front structure, or on the ground that there was no curtilage area at all around the front structure, nevertheless the Fourth Amendment's protection would not prohibit the search, without a warrant, of a building such as the shed any more than it so prohibits a search in an open field. Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924); Marullo v. United States, supra, 328 F.2d at 363; United States v. Potts, supra, 297 F.2d at 69; Care v. United States, 231 F.2d 22, 25 (10th Cir. 1956); Janney v. United States, 206 F.2d 601 (4th Cir. 1953).

■ In addition, the search and seizure would appear valid without a warrant for the independent reason that the federal agents had probable cause to believe that a felony was being committed, and in fact found, at the time of the search of the shed, a felony being committed involving the use of the very items which were seized. United States v. Potts, supra, 297 F.2d at 69; United States v. Hayden, 140 F.Supp. 429, 436, 437 (D.Md.1956).

For the reasons given, the motion to suppress is denied. Also, for the reasons given the Court finds the defendant LaBerge not guilty, and the defendants, Thomas Taylor and Otis Taylor guilty,

---

4. See United States v. Mullin, 329 F.2d 295, 298 (4th Cir. 1964) holding a smokehouse located seventy-five feet from the residence with no intervening fence or driveway to be within the curtilage.

5. If there is a deficiency in the affidavit which causes it to be lacking in probable cause, the defect may not be supplied by testimony taken in a proceeding subsequent to the search. Tripodi v. Morgenthau, 213 F.Supp. 735, 738 (S.D.N.Y. 1962); United States v. Sims, 201 F.Supp. 405, 409 (M.D.Tenn.1962); United States v. Evans, 97 F.Supp. 95, 96 (E.D.Tenn. 1951). See also United States v. Pinkerman, 374 F.2d 988 (4th Cir. 1967); Baysden v. United States, 271 F.2d 325, 327 (4th Cir. 1959). However, in this case, the affidavit of Agent Naylor does show probable cause within its own four corners. The Court permitted testimony to be offered to prove the accuracy or inaccuracy of the characterization of the area as a curtilage; whether the front structure on the property was a dwelling house; and whether the shed was "connected with" the dwelling house within the meaning of 26 U.S.C. § 5601(a) (6). The Court did this to determine if Agent Naylor had affied facts inaccurately. See King v. United States, 282 F.2d 398, 400 n. 4 (4th Cir. 1960) in which Judge Sobeloff stated that testimony showing that "false facts given by the affiant" should be received and that such testimony if accepted "will vitiate the warrant and search." However, in this case, the testimony supports the facts affied to by Agent Naylor in applying for the search warrant.

under all four counts. The Court will order a pre-sentence report prior to sentencing of the Taylors. The existing bail arrangements concerning the two Taylors will continue in force pending imposition of sentence by this Court.