**Jerry Dale MANRY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 61068.

Court of Criminal Appeals of Texas, Panel No. 3.

Sept. 23, 1981.

J. R. Musslewhite, on appeal only, Houston, for appellant.

Carol S. Vance, Dist. Atty., Calvin A. Hartmann and Carl Hobbs, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and DALLY and McCORMICK, JJ.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for possession of hydromorphone, a controlled substance. After the jury found appellant guilty and the State proved a prior burglary conviction alleged for enhancement of punishment, the jury assessed punishment at twenty (20) years' confinement.

The evidence adduced at trial showed that on November 30, 1977, Houston police officer C. T. Black was working in an undercover capacity, and was inside the office of a Houston physician, Dr. Robert Hennessy. This was apparently part of an investigation of Dr. Hennessy based on belief that he was dispensing prescriptions for controlled substances without any legitimate purpose of medical treatment. Black testified that he observed appellant in the doctor's office from 11:15 a.m. to 2:15 p.m. that day, and appellant appeared to be under the influence of some type of drug. Black left the doctor's office and reported his observations to his superior, Captain Alsup, chief of the Narcotics Division.

Officers Charles Robertson and A. J. Hruzek were conducting undercover surveillance of the same doctor's office that day from their vehicle parked outside the office. The officers observed as people would enter the office every 15 minutes or so, and leave 15 or 20 minutes thereafter, carrying what appeared to be prescription blanks. The sign at the office in question indicated that it was the office of Dr. Ezra Wells, a "Doctor of Psychology." Uniformed officers stopped two vehicles leaving the office and found that the occupants had prescriptions.

Based on this information, Robertson also contacted Captain Alsup, and at approximately 6:00 to 6:30 p.m., Alsup, Robertson, Hruzek, and several other officers entered the office. As they entered, Dr. Hennessy was by the door, apparently about to leave, and there were four to six other people in the room, which was a doctor's waiting room. Captain Alsup announced his name and that he was a police officer. According to Robertson, Alsup also ordered everyone to "freeze" and said that everyone was going to be searched. At this point, everyone "scrambled," and appellant began to move behind a counter. Officer Hruzek brought him back around the counter. Hruzek then conducted a search of appellant's person, finding a bottle of pills, a hypodermic syringe, and some money rolled up inside appellant's socks. Appellant was taken into custody. Robertson stated that the occupants of the room were told as soon as the officers entered that they were under arrest.

L. B. Alsup testified that he was a Houston police captain assigned to the narcotics division at the time of the incident in question. He received information from Robertson and Hruzek that prescriptions, presumably illegal ones, were being written at the office they were staking out. Alsup went to the location and with eight other officers entered the office at approximately 6:30 p.m. He saw six people standing in the lobby, and announced his name and that he was with the Houston Police Department, displayed his official identification, and said that he wanted to talk to them. He was approached by a man identifying himself as Dr. Hennessy. At this time, the six people present began circling around in different directions, as if looking for a way to get out. All of the occupants of the room, including Dr. Hennessy, were searched and subsequently arrested. Alsup was present when officer Hruzek searched appellant.

Charlotte Huffman, chemist for the Houston Police Department, testified that she performed chemical tests to identify the drugs found on appellant's person. She determined that there were a number of tablets containing hydromorphone, several tablets containing methaqualone, and several tablets containing phenmetrazine. She also found residue of hydromorphone in the syringe.

For the defense, Dr. Hennessy testified that appellant was a patient of his, who had first come to him for treatment of gunshot wounds to his legs. After having treated him for some time, Dr. Hennessy employed him for "general help and cleanup." He stated that he had prescribed Dilaudid, a commercial preparation of hydromorphone, for appellant's pain. The prescription was for thirty tablets of four milligrams each, to be taken orally every three to four hours as needed. He thought that he also had prescribed methaqualone for appellant as a sedative, as well as phenmetrazine. He stated that appellant was carrying these items in his socks because the shirt and pants he was wearing at the time had no pockets. He had no explanation for the presence of the syringe on appellant's person, but stated that he did not see anything taken from appellant other than one pill bottle. He further stated that all three drugs had been prescribed for appellant as part of Dr. Hennessy's medical treatment and that each was prescribed for a valid medical reason. He denied that prescribing the taking of all three drugs at the same time was unsound medical practice. Another witness called by appellant was the medical records custodian of Ben Taub hospital, who sponsored into evidence records establishing the fact of appellant's gunshot wounds.

In rebuttal, the State called Don Strickland, chief of the organized crime section of the Harris County District Attorney's Office, who testified that Dr. Hennessy had a bad reputation in the community for truth and veracity. Also testifying for the State was Dr. Martin Schide, a physician and surgeon who disputed the testimony of Dr. Hennessy that prescribing the three drugs for simultaneous use was good medical practice. He stated specifically that methaqualone, commercially known as Quaalude, was a sedative, while Preludin, a commercial preparation of phenmetrazine, was a stimulant, and that prescribing a sedative and a stimulant along with a narcotic drug such as Dilaudid, or hydromorphone, would be an unusual combination of drugs. He also stated that Preludin, formerly prescribed as an appetite suppressant, had fallen into disrepute in the medical community due to its habit-forming tendencies, and was not commonly prescribed any more.

■ In his first ground of error,[1] appellant claims that the hydromorphone and the other items admitted in evidence against him were the fruits of an illegal search, because the warrantless entry of the officers into the doctor's office was unlawful. Appellant offers no citation of authorities for this proposition, but merely concludes that the officers had sufficient probable cause to support the issuance of a search warrant and sufficient time to secure one, and that their failure to secure one rendered the entry illegal.

Under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), a defendant who seeks to suppress evidence of crime must show that some personal Fourth Amendment right of his was implicated in the police actions leading to seizure of the evidence. See also *Lewis v. State*, 598 S.W.2d 280 (Tex.Cr.App. 1980). In other words, he must show that he himself had some "legitimate expectation of privacy" that was improperly intruded upon by agents of the government. In *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), this rule was held equally applicable to possessory offenses, and the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80

1. Appellant's appointed counsel (on appeal only) raises this issue as his first ground of error. Appellant in his pro se brief enumerates the same issue as ground of error number five. Since the same issue is raised in both, our disposition applies equally to both.

S.Ct. 725, 4 L.Ed.2d 697 (1960), was expressly abandoned.

The only facts of record regarding appellant's relationship with the doctor's office are that he was seen inside the office for three hours during the day of November 30, 1977, by officer Black, that people entered and left the office freely throughout the day, and that the door was unlocked when the officers entered. We glean from the testimony that the room entered was the type of lobby or anteroom, of a doctor's office that is customarily open to the public during business hours. Dr. Hennessy did testify that the office was not open at the time the officers entered, even though unlocked, but we decline to hold that the trial court erred in discrediting this testimony and allowing evidence of the entry to be placed before the jury. Further, we do not believe that even if Dr. Hennessy's statement were taken as true that this establishes, as a matter of law, that appellant had any reasonable expectation of privacy in the office at the time the officers entered. The first ground of error is overruled.

In his second ground of error, appellant claims that the search of his person was unreasonable and illegal, and that the drugs seized in that search therefore should not have been admitted into evidence. The record is rather confusing as to the theory on which the State relied to justify the search. Captain Alsup testified that when he arrived with the other officers at Dr. Hennessy's office, he "didn't need a warrant," because he believed that prescriptions were being written there, and his only intention at the outset was to talk with those inside and determine if there was a doctor present. He specifically denied having decided beforehand that whoever was in the office would be searched. He stated that after entering, he announced his name and office and that he wanted to talk to the six people on the premises. Only then, when the occupants of the room began running about, some of them apparently intoxicated, did Alsup indicate that any individual person was stopped and searched. He also denied having said when he first entered that everyone was under arrest, but rather maintained that he made such an announcement after seeing several of the persons apparently intoxicated.

Officer Robertson's testimony on this point conflicted substantially with Alsup's. According to him, as the officers entered the office, Alsup announced that they were police officers, told them to freeze, and told them that everyone was going to be searched. He also stated that any time he walked into a place that was to be checked, he would routinely search everyone present for the safety of himself and the other officers. Officer Hruzek, who actually conducted the search of appellant's person, mentioned nothing about taking action to search appellant until he saw appellant and some of the others ". . . acting in a peculiar manner, like if they were going to get rid of something or they were going after some type of weapon." It was at this point that Hruzek ordered appellant to get against the counter and put his hands on it, whereupon Hruzek searched him.

Under the circumstances, we find that the search of appellant was justified. The evidence by the State, uncontradicted by appellant, suggested that an illegal "prescription mill" was begin run out of Dr. Hennessy's office, and that the officers who entered the office between 6:00 and 6:30 that evening had the sort of "articulable suspicion" that entitled them upon entering to detain those on the premises and make further investigation, under the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See also *Greer v. State*, 544 S.W.2d 125 (Tex.Cr.App. 1976), and cases cited therein. In such a situation, officers are entitled to make a brief stop of a suspicious person in order to maintain the status quo momentarily while obtaining more information, and, if they have a reasonable belief that the person being investigated may be presently armed and dangerous, they may make a carefully limited search of the suspect's outer clothing to determine if he has any weapons. *Milton v. State*, 549 S.W.2d 190 (Tex.Cr.App. 1977). While appellant was not necessarily a "sus-

picious person" merely by virtue of his presence in the office, his unusual behavior upon the entry of the officers justified officer Hruzek's action in patting down his person, which resulted in the discovery of the contraband.

One further matter must be discussed under this ground of error, as appellant claims in his *pro se* brief that the search in this case was in violation of *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In that case, officers entered a bar to execute a narcotics search warrant for the bar itself and for the person of the bartender. Upon entering the bar, the officers conducted a search of everyone present, to seize any weapons they might have. Ybarra was "patted down" and the searching officer felt something like a cigarette package with objects in it on his person, but did not immediately remove it. Instead, he searched the other patrons, then returned to Ybarra and removed the package from his pants pocket. Heroin was found inside it, and Ybarra was convicted of possession of a controlled substance.

The Supreme Court held that the Illinois state statute authorizing the search for weapons or contraband of all persons on premises to be searched under a warrant, was unconstitutionally applied in this case, where Ybarra had done nothing in the officers' presence to raise any probable cause to believe that he was in possession of drugs, nor to give them any articulable belief so as to justify a "frisk" of his person under *Terry v. Ohio*, supra.

The instant case is distinguishable on its facts. Had officer Hruzek searched appellant *prior* to appellant's suspicious, furtive movements, perhaps the situation would have been parallel to the facts of *Ybarra*. Here, however, we conclude that this additional factor, which was not present in *Ybarra*, justified the action officer Hruzek took in frisking appellant. Appellant's second ground of error is overruled.

Appellant next contends that the trial court committed fundamental error in failing to instruct the jury to acquit appellant if they had a reasonable doubt whether his possession of hydromorphone was under the authority of a lawful prescription. He admits that the charge properly instructed the jury that possession of a controlled substance is unlawful ". . . unless such drug was delivered by a pharmacist upon an original prescription of a practitioner or said drug was delivered by a practitioner in the course of his practice." His complaint, however, is that the trial court failed to apply this law to the facts of the case and direct the jury that they must acquit appellant if they had a reasonable doubt as to whether he was in lawful possession.

We agree with the State's assertion that there was no objection to the charge, nor any special requested charge, based on appellant's present contention. See Articles 36.14, 36.15, V.A.C.C.P. Under such circumstances, any alleged error was waived. *Mills v. State*, 508 S.W.2d 823 (Tex.Cr.App. 1974); *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App. 1980). Furthermore, the charge as given to the jury adequately instructed them on the law applicable to the case, and there is no indication that the charge as given denied appellant a fair and impartial trial. Article 36.19, V.A. C.C.P. The jury heard Dr. Hennessy's testimony and the State's rebuttal evidence, and apparently chose not to believe Dr. Hennessy. Appellant's third ground of error is overruled.

We also have examined the other allegations in appellant's pro se brief and find that they are without merit.

The judgment is affirmed.