Lloyd GOEHRING, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 60754.

Court of Criminal Appeals of Texas, Panel No. 1.

Jan. 27, 1982.

Gary J. Cohen, Brady S. Coleman, Austin, for appellant.

Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before ROBERTS, DALLY and TEAGUE, JJ.

## OPINION

TEAGUE, Judge.

This is an appeal from a conviction for the offense of possession of more than four ounces of marihuana. A jury determined appellant's guilt, assessed his punishment at seven years' imprisonment and a $5,000 fine, and recommended that imposition of the sentence be suspended and that appellant be placed on probation. The trial court accordingly placed appellant on seven years' probation, but required that the $5,000 fine be paid as a condition of probation.[1]

In two grounds of error, appellant contends that the trial court erred in overruling his motion to suppress the marihuana that was seized by law enforcement officers because there was (1) a warrantless "aerial search" of the property where the marihuana was located, and (2) a warrantless, nonconsensual "ground entry" search and seizure mission was made by law enforcement agents on what is hereinafter described as the Jarvis Ranch property, after which marihuana plants were chopped down and hauled away by the law enforcement officials.

Initially, we note that the marihuana plants which were seized by law enforcement agents, and which resulted in the instant prosecution, were first viewed as a result of an inadvertent byproduct of a separate and unrelated investigation. The record reveals that on October 7, 1977, two Department of Public Safety[2] helicopter pilots, Joe Herring and Wesley Hord,[3] were requested by their supervisor, Roy Sweetnam, to fly a D.P.S. helicopter to a location near Wimberly in Hays County, where a camper pickup truck loaded with marihuana had been abandoned by two men who had fled on foot into the countryside.[4] Herring and Hord's instructions were simply to assist the "ground officers" in their search for the two unidentified men, who incidentally were never found by the search party. While searching for the two suspects, in an area five to six miles from the abandoned camper vehicle, at an altitude of 50 to 75 feet, Herring and Hord visually observed

---

1. The requirement that appellant pay the $5,000 fine is the subject of appellant's third ground of error, discussed *post.*

2. Hereinafter referred to by the acronym, D.P.S.

3. The name Hord is also spelled "Hoard" in the statement of facts.

4. The record is rather sketchy concerning the two unidentified males. However, there is no showing by the record of any connection between the two men, the abandoned camper pickup truck, and the appellant and the appellant's co-defendant, W. C. Jarvis.

from the air a field of growing marihuana plants, at least one acre in size,[5] in which sprinklers were running, one man was working with a hoe, and another, older man, was "walking out into the patch." Herring and Hord each identified appellant and his co-defendant, Jarvis,[6] as the men they saw in the field of marihuana plants.

Herring testified that while watching the two men from the air, he observed the younger man, apparently referring to appellant,[7] walk to and get into a red colored Dodge pickup truck, and drive to a house some undisclosed distance from the growing marihuana plants. The older man was seen to converse with appellant before his departure, and was later seen walking along a nearby creek.

Herring and Hord contacted by radio D.P.S. narcotics agents, David Prater and Richard Madden, who were also investigating the abandoned camper pickup truck and the whereabouts of the two missing suspects.

Herring and Hord thereafter landed their D.P.S. helicopter and picked up Prater and Madden. After becoming airborne, they made one additional pass over the field of growing marihuana plants, which field was by this time unoccupied. They thereafter landed the helicopter across the main road from the entrance to what one officer had recognized as the "Jarvis Ranch." They were met by several law enforcement vehicles containing other D.P.S. officers, Hays County Sheriff's deputies, and Department of Parks and Wildlife game wardens.

The ground motor vehicles containing the law enforcement officers were driven through an unlocked wiremesh metal type gate which was apparently open, and proceeded down a private road toward the Jarvis Ranch, where they subsequently encountered an outer perimeter of the Jarvis Ranch property, which was marked by a second gate, that was locked. The record does not reflect whether there was a fence on either side of that gate, or whether there were any "posted" or "no trespassing" signs on the property. Deputy Sheriff Cary Young testified that law enforcement officers lifted the gate off its hinges, in order to gain entry to the Jarvis Ranch property. Some of the officers then proceeded toward the location of the growing marihuana crop, and others went to a house, which was located one quarter to one half mile from where the second gate was situated. Interestingly, the marihuana crop was also located one quarter to one half mile from the house, but in a different direction from the second gate.

The record does not show whether the above house was the same house to which appellant had driven earlier, as there were at least two residences on the Jarvis Ranch. The officers were unable to locate anyone, including Jarvis and appellant, on the property at this time, although they did find an unoccupied red colored pickup truck parked near one of the residences.

Approximately 20 law enforcement officers were present during the subsequent seizure of the growing marihuana plants. A flatbed truck was used to transport the marihuana plants, which totaled approximately 1600 pounds, to the City of Austin.

It appears that after the seizure of the marihuana plants was complete, all of the law enforcement personnel then left the Jarvis Ranch, although there is evidence in the record that at least two of the officers

---

5. The size of the marihuana crop was more specifically described as follows: "It was a couple, three hundred yards long, maybe seventy-five yards wide ..." Herring described the marihuana plants as follows: "... biggest marihuana I have ever seen in my life." "It looked to me like [the plants] were ten to twelve feet tall." Compare, Grinspoon, *Marihuana Reconsidered*, at page 32: "The plant may reach a height of 16 to 20 feet, or reach maturity at 1 foot, depending on varying conditions."

6. The transcription of the court reporter's notes of the formal sentencing in this cause indicates that Jarvis committed suicide after the punishment phase of the joint trial but before the formal sentencing occurred. Thus, for this reason, if no other, his conviction is not before us for review.

7. The record reflects that appellant was 36 years old at the time of trial; Jarvis was 61 years old.

returned that night, at which time Jarvis was present and questioned by them. The record does not show that appellant was present on the ranch premises at that time, nor does it show the content of the conversation the officers had with Jarvis. No arrests were made at that time. Arrest warrants for Jarvis and appellant were subsequently obtained on October 9, 1977, and Jarvis was apparently arrested at his home by law enforcement agents on that date. There is no testimony in the record as to when or where appellant was arrested.

In addition to the foregoing evidence, the trial court heard stipulated evidence, upon which the jury reached its verdict, before ruling on appellant's motion to suppress the marihuana obtained from the Jarvis Ranch. The only stipulation of evidence which sheds any additional light on the issues now under consideration is the following:

> ... that officers of the Hays County Sheriff's Office determined that W. C. Jarvis owned the premises in question and lived there; that Lloyd Goehring lived in a separate house on the premises.

Appellant appears to contend on appeal that because Herring and Hord intentionally flew Prater and Madden, whom appellant claims were "trained narcotics agents," over the field of growing marihuana plants, their flight constituted an illegal intrusion. This "primary and initial illegal intrusion," argues appellant, therefore rendered any seizure thereafter of the marihuana plants illegal. Appellant also appears to contend that as Prater and Madden and the other law enforcement officials went on the premises of the Jarvis Ranch property without either consent or a search warrant, this constituted further illegal activity.

■ We first note that a warrantless search is per se illegal. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ However, we do not find under the above facts that the above aerial observation of the marihuana plants falls within a protected area of the Fourth Amendment, but in fact find the observation of the marihuana plants was without any protected area and actually falls within the confines of the open fields doctrine. Compare, however, J. Clinton's concurring opinion in *Ebarb v. State*, 598 S.W.2d 842, 851 (1980), and J. T. Davis' discussion in *Cantu v. State*, 557 S.W.2d 107, 109 (1977), regarding the term curtilage.

It also appears by the record that the discovery and seizure of the growing marihuana plants, by the law enforcement agents cutting the plants down and thereafter taking possession of same, occurred in an open field not near the residences of Jarvis or appellant.

Appellant, in the arguments he makes in his brief, appears to contend that the fact that the law enforcement officers may have committed a technical warrantless trespass over and on the premises of the Jarvis Ranch automatically makes any subsequent search and seizure of the marihuana illegal.

We note that the Fourth Amendment to the Constitution protects people and not simply places or areas. It protects the citizen, whether innocent or guilty, against every unjustifiable intrusion by the government upon his privacy, and it has been said that this amendment confers on the citizen, as against the government, "the right to be let alone." *Kroska v. United States*, 51 F.2d 330, 332 (8th Cir. 1931).

In this cause, under the unique facts presented in this appeal, we are actually confronted with two doctrines of law, i.e., the open fields doctrine and the doctrine of standing.[8] Concluding that it makes little or no difference which doctrine we first discuss, we will now discuss the open fields doctrine.

Under the open fields doctrine, no warrant was necessary for the police to enter

---

8. Recognizing that the legal concept of standing has at this time been replaced in Texas by the concept of legitimate expectation of privacy, see fn. 9, *post*, unless stated to the contrary in this opinion we do not use the word standing to reflect a concept, but merely to reflect a status.

onto the Jarvis Ranch property, and the fact of a technical trespass is irrelevant because an open field is usually not a constitutionally protected area. See *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *United States v. Brown*, 473 F.2d 952 (5th Cir. 1973); *Ochs v. State*, 543 S.W.2d 355 (1976); *Melton v. State*, 121 Tex.Cr.R. 195, 49 S.W.2d 803 (1982).

The term or phrase, "open fields," ordinarily means a specified unoccupied location within a broad, level, and open expanse of land, which may or may not have agricultural type crops growing thereon.

The open fields doctrine was explicated by Mr. Justice Holmes in *Hester, supra*, as follows:

> . . . the special protection accorded by the Fourth Amendment to the people in their persons, houses, papers and effects, is not extended to open fields. The distinction between the latter and the house is as old as the common law. 4 Bl.Comm. 223, 225, 226. 265 U.S. at 59, 44 S.Ct. at 446, 68 L.Ed. at 900.

We note that some courts have held that the open fields doctrine, promulgated by *Hester*, has been overruled sub silentio by the use of the "legitimate expectation of privacy" analysis enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and recent cases which rely on *Katz*, such as *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Other courts have held that *Hester* remains viable because one can rarely, if ever, have a legitimate expectation of privacy in a truly open field; or have held that *Hester* survives completely unaffected by *Katz* and other cases which discuss privacy interests. See, LaFave, *Search and Seizure, A Treatise on the Fourth Amendment*, Sec. 2.4 (1978), particularly the cases cited in footnotes 16 and 17 at p. 333. See also *State v. Cemper*, 209 Neb. 376, 307 N.W.2d 820 (1980); *Gaylord v. State*, 613 S.W.2d 409 (Ark.App. 1981); *State v. Brady*, 379 So.2d 1294 (Fla. App.1980).

Other courts, see *Burkholder v. Superior Court*, 96 Cal.App.3d 421, 158 Cal.Rptr. 86 (1979), have held: "The absolute limitation placed upon Fourth Amendment protection under the 'open fields' doctrine of another era (see *Hester v. United States*, supra) is no longer viable," adopting in such factual cases as we have here a two prong test that must be fully satisfied before a warrantless non-consensual search and seizure may be sustained and upheld, taking the position that if there is first an aerial surveillance of a particular location, which is found to be lawful, nevertheless, a subsequent ground entry search that results in a warrantless non-consensual seizure must also be proved to be lawful.

We observe however that the Supreme Court in *Air Pollution Variance Board v. Western Alfalfa Corporation*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), unanimously adhered to *Hester, supra*, and again refused to extend the Fourth Amendment to "sights seen 'in the open fields'." There, a health inspector conducted daylight, visual pollution tests of smoke being emitted from a business' chimneys at a distance from the business. The Supreme Court held that the inspector's actions did not constitute an unreasonable search within the meaning of the Fourth Amendment.

> Depending upon the layout of the plant, the inspector may operate within or without the premises but in either case he is well within the 'open fields' exception to the Fourth Amendment approved in *Hester*. (416 U.S. 866, 94 S.Ct. 2116, 40 L.Ed.2d 611).

As to "the business' expectation of privacy," the Court held that "if it can be said to exist, [it] is abstract and theoretical."

In our cause, the initial "visual to the naked eye" observation of the marihuana plants from the air by Herring and Hord did not occur in an intentional manner, but occurred in an inadvertent manner when they were dispatched to fly their D.P.S. helicopter to a particular location in order to assist other law enforcement agents in locating and finding two unidentified male

subjects, who had abandoned a pickup truck that was loaded with marihuana. Neither Herring nor Hord were shown to have known appellant or Jarvis prior to the day in question, nor were they aware of the marihuana crop until they saw it on this occasion. The marihuana plants they observed from the air were in plain view, and were not hidden or concealed. We find the aerial overflight of Herring and Hord, which revealed to their naked eyes a crop of marihuana plants, did not violate any Fourth Amendment rights of the appellant.

Because every aerial search type case must stand on its own merits, we do not adopt an absolute rule of law that in such cases there can never be a reasonable expectation of privacy by an accused. See and compare, *Burkholder v. Superior Court*, supra, 158 Cal.Rptr. at page 89.

█ Finding no merit to appellant's contention there was an unlawful *aerial* search, we now go to the land to see whether appellant had a reasonable and legitimate expectation of privacy in the Jarvis Ranch property. We find, after reviewing the record, he did not.

Generally, and in most jurisdictions, the right to challenge the lawfulness of a search is limited to persons with "standing," that is, to those who have been aggrieved by a search and seizure. However, we note that:

The concept of having standing to raise a Fourth Amendment claim has actually been replaced by the concept that a defendant must be able to show a reasonable expectation of privacy prior to asserting a Fourth Amendment claim.

Matthew-Bender's *Texas Criminal Practice Guide*, (Vol. I, p. 30–6). Compare, *Rawlings v. Kentucky*, supra, *Bodde v. State*, 568 S.W.2d 344, 352 (1978).

There is no longer an "automatic standing rule" under the Fourth Amendment in possessory offense cases. See, *United States v. Salvucci*, supra, which overruled *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1950).[9] It was therefore incumbent upon appellant to show that he had some proprietary or possessory interest in the Jarvis Ranch property, that was invaded by the law enforcement officers, in order for him to legally complain of any search and seizure by law enforcement officers. Largely on account of appellant's failure to testify at the suppression hearing[10] we are left almost completely in the dark as to what appellant's relationship to the Jarvis Ranch premises was at the time the offense was committed.

Only two pertinent facts appear in the record: appellant was seen working with a hoe in a field of growing marihuana plants, and lived in a house separate from that of Jarvis on the ranch premises. The record does not reveal appellant's interest in the residence where he was living at the time, i.e., whether he leased it, resided there as a guest, received lodging on account of his employment on the ranch,[11] or was merely

---

9. We observe that the New Jersey Supreme Court has recently, see *State v. Alston*, 586 S.W.2d 879 (1981), declared that the recent decisions of the Supreme Court provide persons *with inadequate protection against unreasonable* searches and seizures, regarding "standing," and ruled that it would subscribe to the automatic standing concept in possessory offenses. A majority of this Court, however, has adopted the rule that a defendant who seeks to suppress evidence of crime must show that some personal Fourth Amendment right of his was implicated in the police actions leading to seizure of the evidence. See *Lewis v. State*, 598 S.W.2d 280 (1980); *Manry v. State*, 621 S.W.2d 619 (1981). In other words, an accused in Texas must show that he himself had some "legitimate expectation of privacy" that was

improperly intruded upon by agents of the State. See *United States v. Salvucci*, supra.

10. Appellant would have incurred no self-incrimination risk by testifying at the suppression hearing. When a defendant testifies in support of a motion to exclude evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of his guilt unless he makes no objection. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

11. Appellant's testimony at the punishment hearing that he was employed by Jarvis as a ranch hand came too late to aid him or us on the issues raised by his motion to suppress evidence. And in any case, this single additional fact, standing alone, would not have estab-

trespassing on the property. Nor, are we informed of the duration of his residence on the ranch; he may have been there for one or more days prior to the seizure of the marihuana. We also do not know the number of persons who may have resided on the ranch, had access to the ranch or whether appellant had any authority to exclude others from the premises.[12]

Appellant's factual situation therefore appears to resemble that of the defendant in *Lewis v. State*, supra, who had permission to spend the night in a house entered by the police shortly before the defendant's 5:00 a. m. arrival. This Court held that the defendant made an insufficient "showing of any personal Fourth Amendment interest in the premises and property in question." Although in this cause appellant filed and argued a motion to suppress evidence, we find that the following language from *Lewis* is otherwise applicable to our facts:

There was no motion to suppress the evidence complained of, and thus no attempt to offer evidence from appellant or any other competent source as to what relationship existed between appellant and the premises at the time the officers entered. *There may have been such a relationship, but appellant failed to establish its existence as he was required to do.* 598 S.W.2d at 283 (Emphasis added).

We find after reviewing this record that appellant has failed to show that he had an interest in the Jarvis Ranch property sufficient to enable him to complain of the law enforcement officers' invasion of that property. Cf. *Kleasen v. State*, 560 S.W.2d 938 (1977). Appellant's first two grounds of error are overruled.

 In his third ground of error, appellant contends that the trial court erred in requiring him to pay, as a condition of probation, the $5,000 fine assessed by the jury.

The completed verdict form utilized by the jury reads as follows:

We, the Jury, having found the defendant, Lloyd A. Goehring, 'Guilty as Charged in the Indictment,' assess his punishment by confinement in the Texas Department of Corrections for a period of 7 years, and in addition to such confinement, assess a fine of $5,000; we further find from the evidence that the defendant has never been convicted of a felony in this or any other state, *and we do recommend that the imposition of his sentence be suspended* and that he be placed on probation under the further orders of this court. (Emphasis added.)

Over five years ago, this Court considered the effect of an almost identical jury verdict in *Chudleigh v. State*, 540 S.W.2d 314 (1976), in which the trial court also required the defendant to pay a fine in its order of probation. This Court held that where the jury recommends that a fine that is assessed be probated, the trial court cannot order it to be paid. See also *Shappley v. State*, 520 S.W.2d 766 (1975). Cf. Art. 42.-12, Sec. 6, V.A.C.C.P.

The judgment is therefore reformed to delete the payment of the $5,000 fine from the conditions of probation, and to instead show that payment of the fine is probated, in conformance with the jury's verdict.

As reformed, the judgment is affirmed.

ROBERTS and DALLY, JJ., concur in the result.

---

lished a legal possessory interest in his employer's premises. See *Johnson v. State*, 583 S.W.2d 399 (1979); *State v. Cemper*, supra.

12. The import of the right to exclude others from the premises is discussed in *Rakas*, supra, at fn. 12, 439 U.S. 143, 99 S.Ct. 430, 58 L.Ed.2d 401 (1978).