UNITED STATES of America, Appellee,

v.

Larry G. VAN DYKE, Appellant.

No. 79–5101.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1980.

Decided Feb. 26, 1981.
Rehearing Denied April 28, 1981.

J. Flowers Mark, Alexandria, Va. (Barry Wolf, Mark & Moffitt, Alexandria, Va., Frank Mika, Meisnere & Mika, Washington, D.C., on brief), for appellant.

Catherine C. Blake, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Kurt L. Schmoke, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

BUTZNER, Circuit Judge:

Larry G. Van Dyke appeals his conviction under 21 U.S.C. § 841 and 18 U.S.C. § 2 for possession of marijuana with intent to distribute. Van Dyke claims that evidence seized pursuant to his warrantless arrest should have been suppressed because probable cause for his arrest was obtained through violation of the fourth amendment. We reverse and remand for new trial.

I

Van Dyke was arrested outside a residence in rural Maryland. Built on waterfront property, the house sits in the middle of an extensive lawn which is bounded by water, trees, and a dirt road. This road leading from a public highway provides the

only vehicular access to the property. The house is not visible from the highway.

The evening of the arrest, federal customs officers, who had been alerted to the likelihood of drug traffic at the residence, conducted surveillance from a neighbor's adjoining property. They could see cars arriving and persons entering the house. At approximately 8:30 p. m., in the words of one officer, "It had gotten dark so we moved in closer to the property so we could have a better vantage to conduct our surveillance." The officers walked through the trees growing along the boundary between the two properties, climbed a fence, and moved 15 feet beyond the fence to a location 150 feet from the residence. There they lay down in a patch of honeysuckle bordering the mowed lawn.

At about ten o'clock, the officers saw a van and a pickup truck stop at the house. After observing plastic-wrapped packages being loaded from the van to the truck, one officer moved "right against the garage" to obtain a better view. When Van Dyke walked within two feet of him, the officer whispered "Come here" to Van Dyke, who screamed and ran. The officers pursued Van Dyke, arrested him, and seized the packages in the truck, which contained marijuana.

After a suppression hearing, the district court held:

> [A]gents are allowed to trespass upon individual's property as long as they do not search the house or curtilage, and do not physically enter or peer into enclosed buildings, vehicles or the like.... If the agent, through his observations, develops probable cause to believe that a crime is being committed, he may further enter the property in order to effect an arrest.

The district court found that because the officers were 150 feet from the house, their presence 15 feet within the fence did not infringe the curtilage. It held that the officers' observations from that vantage point, coupled with their knowledge of how marijuana was packaged, justified the arrest. It therefore refused to suppress the evidence regarding the marijuana seized pursuant to the arrest.

## II

■ Because expectations of privacy are inherent in the common law concept of "curtilage,"[1] we have recently reiterated that absent exigent circumstances a warrantless search of one's home or its curtilage, when effected through trespass, violates the fourth amendment. *See United States v. Jackson*, 585 F.2d 653, 660 (4th Cir. 1978) (dictum).

■ We cannot agree with the district court that because the officers were situated 150 feet from the residence, their surveillance comported with the fourth amendment. We note, however, that *United States v. Bensinger*, 546 F.2d 1292 (7th Cir. 1976), offers support for such a per se rule. In *Bensinger* the questioned area was a fenced goose house 400 feet from the dwelling. Between the goose house and the dwelling were another fence, a farm road, and a parking area. Although the area around the goose house clearly appears to have been located outside the curtilage, the court went on to review numerous appellate decisions involving the issue of the reach of the curtilage. It found only one case in which an area over 100 feet from the house was still held within the curtilage.[2] It cited five cases, including our own decision in *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973), in which areas located 80 to 300 feet from the residence were held outside the curtilage. The *Bensinger* opinion concluded that these cases "enunciate a clear rule: any outbuilding or area within 75 feet is within the curtilage and any outbuilding or area further than 75 feet is outside the curtilage." 546 F.2d at 1297.

---

1. The curtilage has been defined as "an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with a dwelling." *United States v. LaBerge*, 267 F.Supp. 686, 692 (D.Md.1967).

2. *Walker v. United States*, 225 F.2d 447 (5th Cir. 1955) (barn located 210–240 feet from the dwelling).

■ We decline to apply a 75-foot per se rule in this case. As most courts recognize, distance is just one of many factors to be weighed when determining the reach of the curtilage. For example, in *Care v. United States*, 231 F.2d 22, 25 (10th Cir. 1956), the court said, "Whether the place searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family". Indeed, in concluding that particular areas were not within the curtilage, the opinions cited by the *Bensinger* court stressed other factors arguably as important to their rulings as distance. We held in *Minton* that when officers had stationed themselves on an embankment approximately 80 feet away from a building located on the defendant's property, "such a location at such a distance [was] probably not within the curtilage." There had been no showing in that case, however, that the embankment was part of a yard. Additionally, we noted that the embankment had not been clearly shown to be on the defendant's property, and we expressed doubt that the building itself was primarily used as a residence. 488 F.2d at 38 & n.1.

Similarly, in *Janney v. United States*, 206 F.2d 601, 602 (4th Cir. 1953), the officer had positioned himself outside of the exclusionary fence that enclosed the dwelling and outbuildings. In *Hodges v. United States*, 243 F.2d 281 (5th Cir. 1957), the chicken house searched by the agents was separated from the dwelling by two exclusionary fences. In *Brock v. United States*, 256 F.2d 55 (5th Cir. 1958), the small concrete house searched by agents was separated by an exclusionary fence from residence, which moreover was not in use as a dwelling house at the time. And finally, in *Fullbright v. United States*, 392 F.2d 432 (10th Cir. 1968), the court stressed there was no evidence that the area from which officers conducted surveillance was within any yard or other enclosure related in use or purpose to the house or its outbuildings.

In the present case, because the honeysuckle patch occupied by the officers was within the exclusionary fence, we think the officers conducted their surveillance from within the curtilage. The fence marked a boundary and served to exclude others from entering the property adjacent to the dwelling. The lawn, which clearly was a part of the residence's curtilage, was only 15 feet away from this fence, and we can see no reason to exclude this 15-foot strip between the fence and the lawn from the protection usually extended to enclosed yards.

The government has cited no cases in which a building or area within an exclusionary fence surrounding a residence was found to be outside the curtilage. Assuming that sheer distance could in some instances lead us to conclude that a particular area was outside the curtilage even though inside a fence surrounding a residence, this case does not present such a situation. All the physical attributes of the house and its surrounding land bespeak expectations of privacy. The house, screened by trees, is located in an isolated, rural area with entry provided by a dirt road posted "no trespassing." In such a secluded setting, it is reasonable to conclude that the curtilage embraces an area 150 feet from the residence, especially when the lawn extends virtually that far and a fence limits access.

### III

■ Because the government may elect to retry Van Dyke, we emphasize the narrowness of our ruling. We do not hold that Van Dyke has established that he personally had a reasonable expectation of privacy in the house and curtilage the night of the search. At the time of the trial, Van Dyke had "automatic standing" under *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and the district court understandably found it unnecessary to explore his specific expectation of privacy. After Van Dyke's trial, however, *Jones* was overruled by *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

Instead of approaching fourth amendment issues through a two-step analysis considering first the issue of standing and then the substantive scope of the amend-

ment's protection, the Supreme Court has now instructed us to consider only the substantive question whether a particular defendant had a legitimate expectation of privacy in the area searched. *United States v. Salvucci*, 100 S.Ct. at 2553. *See also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

Here we reverse only the district court's ruling that the area occupied by the officers for surveillance was outside the curtilage. Because Van Dyke relied on automatic standing as provided by *Jones*, he had no occasion to introduce evidence to establish that he had a legitimate expectation of privacy in the curtilage. If the government elects to retry him, he should have an opportunity to demonstrate, if he can, that his own fourth amendment rights were violated. *See Salvucci*, 100 S.Ct. at 2555.

We find no merit in Van Dyke's other assignment of error.

*REVERSED AND REMANDED.*