473 A.2d 1289

**William Harry SPROATES, Jr.**

v.

**STATE of Maryland.**

**No. 975, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 13, 1984.

**548**

Cynthia E. Young, Assigned Public Defender, with whom was Alan Murrell, Public Defender, on brief, for appellant.

Valerie J. Monaghan, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Bernard A. Penner, Asst. Atty. Gen., J. Frederick Price, State's Atty. for Kent County and Suzanne Schmoldt, Asst. State's Atty. for Kent County, on brief, for appellee.

Argued before WILNER, ALPERT, and BLOOM, JJ.

ALPERT, Judge.

A confidential informant advised the Maryland State Police that William Harry Sproates, Jr., appellant, was distributing marijuana and concealing that marijuana in trailers located on appellant's farm near Golts, Maryland. Because the informant's information was insufficient to justify the

issuance of a search warrant, Trooper Roger L. Layton was dispatched to verify the informant's assertions.

Appellant's five acres of property was bounded on the west and south by the Millington Wildlife Management Area and on the north by railroad tracks.

On the evening of December 6, 1982, the trooper followed directions provided to him by the informant and entered appellant's property by way of a logging path from the wildlife area. Trooper Layton was not aware he had trespassed upon appellant's property. There were no "No Trespassing" signs posted and no fence or gate restricted his entry onto the land. Almost immediately, Trooper Layton came upon one of the three trailers described by the informant. The trooper saw no signs of habitation in the silver-colored trailer and did not espy and type of residence nearby. The trailer was located in a "junky area" and was surrounded by old cars and cinderblocks. The door to the silver trailer was missing and an old board was acting as "a ragged type of door." Trooper Layton was able to observe the contents of the trailer by looking through the partially opened doorway. He viewed what he believed to be marijuana hanging inside the trailer. The trooper's criminal investigation training led him to believe that the marijuana was being dried prior to processing and packaging. Forthwith, Trooper Layton left this area in order to obtain a search warrant. The trooper had been in this area for no more than two minutes.

As he walked away from the trailer, Trooper Layton followed a boundary line marked with string and wire. When he reached the end of this line, the trooper noticed several "No Trespassing" signs on the property's main drive as well as a jug with the words "Bad Dog W. Sproates" printed on it. This was further confirmation that Trooper Layton had investigated the property described by the confidential informant.

Thereafter, Trooper Layton completed an affidavit seeking authorization to search appellant's property, the trail-

ers, and any person or vehicle found on that property. District Court Judge H. Thomas Sisk Jr. reviewed the affidavit and issued the warrant at approximately 8:00 p.m. on December 7, 1982.

Two hours later the warrant was executed by Trooper Layton and three other members of the Maryland State Police. Large quantities of suspected marijuana were seized from the silver trailer observed the previous evening by Trooper Layton. Also discovered in that trailer was a shotgun with a cord hooked around the trigger. The troopers then proceeded to a red and white trailer located 100–150 yards away. After checking for possible boobytraps, the troopers cut a padlock off the trailer's door. Trooper Layton observed more suspected marijuana. Two rifles and a single beam balance were also discovered. The troopers then walked to a gray-colored trailer. More suspected marijuana was located.

Troopers Pinder and Price were assigned to stake out appellant's property while the seizures were taking place. At approximately 1:25 a.m., on the morning of December 8, 1982, Trooper Pinder observed a vehicle leaving the property without its headlights illuminated. The lights of the vehicle, a pick-up truck, were turned on at the end of the property's driveway. The truck was stopped; its occupants were identified as appellant and William Harry Sproates, III, appellant's son. The two men were "patted down." Several shotgun shells were found in appellant's pocket. An unloaded single-barrelled shotgun was found in the truck's floorboards, a loaded Magnum was found beneath clothing on the front seat, and eleven shotgun shells were found in the truck.

Trooper Layton was summoned to the area where appellant, his son, and the truck had been stopped. He observed that both men had a "leafy material and residue on their clothing." Trooper Layton then conducted his own search of the truck and found a small quantity of marijuana in the glove compartment.

At this point, Trooper Layton decided there was a need to search the property's residence. Thereafter, he left the property and applied for a second warrant. Included in this warrant's affidavit was the aforementioned activity. Judge Sisk issued the second search warrant between 4:00–5:00 a.m. on December 8, 1982 and the premises were searched at approximately 6:00 a.m. Seized were suitcases, jars, boxes, and bags of suspected marijuana and other paraphernalia commonly used to manufacture, package and distribute illegal substances.

All evidence seized from the trailers, the truck and appellant's house were determined to be marijuana. Two State pick-up trucks carted away the marijuana on appellant's property. A total of 600 pounds was seized. In walking distance, the trailers were located more than a mile[1] from the property's residence.

A State motion to consolidate the cases against appellant and his son was granted. Both defendants moved to suppress all evidence seized pursuant to the two search warrants, alleging that the warrants had been issued without probable cause. The defendants argued that Trooper Layton's December 6, 1982 entry onto the property was illegal and that the trooper's observation of the trailer and its contents was constitutionally impermissible. Moreover, appellant and his son prayed that all evidence seized from the truck and house also be suppressed because these items were not described with particularity in the search warrants.

A suppression hearing was duly conducted and the motion was denied. A court trial before Chief Judge George B. Rasin, Jr. in the Circuit Court for Kent County ensued and both defendants were convicted for possession of and intent to distribute marijuana arising out of the violations

---

1. Although at first blush it may appear that there cannot be a distance of one mile included within a five acre tract, we believe that it is mathematically possible considering the triangular shape of the property. In any event, this is not an issue before us.

discovered on December 7, 1982 (execution of first search warrant), possession of and intent to distribute marijuana arising out of the violations discovered on December 8, 1982 (execution of the second warrant), possession of drug paraphernalia, and a handgun violation. Appellant received a five year sentence and a $5,000. fine for the December 7, 1982 violations, a five-year sentence and a $5,000 fine for the December 8, 1982 violations, and a one-year sentence on the handgun charge. All sentences were ordered to run consecutively.

Aggrieved at these developments, appellant [2] seeks reversal of his convictions and argues that:

 I. The trial court erred in failing to grant appellant's motion to suppress.

 II. The convictions of appellant for possession in a sufficient quantity to indicate manufacture and simple possession under both the indictment relating to December 7, 1982 and December 8, 1982 constitute a violation of the double jeopardy clause of the United States Constitution.

 III. Appellant was not properly convicted for a violation of Article 27 Section 36B, for unlawful possession of a handgun.

 IV. Appellant was entrapped as to commission of the handgun offense.

We perceive no error and shall affirm.

### I. *Motion to Suppress*

Appellant contends that his motion to suppress should have been granted because there was no probable cause for the issuance of the first warrant. From this, he asserts that the illegality of the first search has a domino effect precluding the admissions of evidence seized when his truck was stopped and pursuant to the second warrant. Appellant reasons that no probable cause existed for the first

---

**2.** Appellant's son is not involved in this appeal.

warrant because Trooper Layton's observation of the marijuana in the trailer was effectuated by way of an impermissible warrantless search. Appellant overlooks the possibility that the trooper may not have needed a warrant to make his observation. Instead, he has leapt headlong into the merits of a Fourth Amendment controversy without "lingering at the threshold to inquire whether the Fourth Amendment is applicable so as even to require satisfaction." R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 25.0 at page 279 (1983).

Chief Judge Rasin denied appellant's suppression motion because Trooper Layton's activities occurred in an uninhabited open area. Even though the trooper had committed a technical trespass, the trial judge found, "under the circumstances ... he had a right to make the investigation and attempt to verify the information that was furnished him."

█ The term "open area" used by Chief Judge Rasin alludes to the Open Fields Doctrine first articulated in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Internal Revenue Service agents had received a tip that Hester was manufacturing moonshine. Based on this information, the federal investigators trespassed upon Hester's property, remaining 50–100 yards from the house. Hester was observed with a bottle of moonshine, a chase occurred, and a jug and bottle of moonshine whiskey were recovered and introduced over objection at Hester's trial. Hester argued that the seizure had been illegal due to the warrantless seizure and the agents' trespass. The Supreme Court affirmed the conviction in a three-page opinion. The Court observed that the evidence had not been obtained by entry into Hester's house. Speaking through Justice Holmes, the Court held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended [to observations from] the open fields." *Id.* at 59, 44 S.Ct. at 446. Thus, the dwelling and the surrounding living area—known

as the curtilage—was protected by the Fourth Amendment; areas beyond the curtilage were not.

Following *Hester*, courts broadly defined the words "open fields." Areas which were fenced in and posted with "No Trespassing" signs have been viewed as "open." LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.4 at page 332 (1978). The word "fields" has been applied to cases where police have entered wooded areas, vacant lots in urban areas, beaches, reservoirs, and open waters. *Id.* The term "curtilage" has been described as "an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with the dwelling." *United States v. LaBerge*, 267 F.Supp. 686, 692 (D.Md. 1967). There is no requirement, however, that a fence or gate be present to establish a curtilage. *Harris v. State*, 203 Md. 165, 169, 99 A.2d 725 (1953). Areas such as garages, gardens, sheds, "out houses," and barns have all been held to be within a home's curtilage. Examples may be found in 79 C.J.S. *Searches and Seizures* § 13 (1952, 1983 Cum.Supp.); 68 Am.Jur.2d *Searches and Seizures* § 20 (1973, 1983 Cum.Supp.); and Cook, *Constitutional Rights of the Accused—Pre Trial Rights* § 59 (1972, 1983 Cum.Supp.). Some courts examine the distance from the residence when determining whether an area is within the curtilage. One federal court of appeals compiled a chart of curtilage cases and concluded that any "outbuilding or area within 75 feet is within the curtilage and any outbuilding or area further than 75 feet is outside the curtilage." *United States v. Bensinger*, 546 F.2d 1292, 1296–97 (7th Cir.1976), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977). *But see United States v. VanDyke*, 643 F.2d 992, 994 (4th Cir.1981) where the Fourth Circuit rejected *Bensinger*'s per se approach and stated that distance is only one of many factors to be weighed when determining the reach of the curtilage. These other factors included proximity or annexation to the dwelling, inclusion within the general enclosure surrounding the dwelling, and use and enjoyment of an area for domestic purposes. *Id.*

The *Hester* holding embodies the theory that the Fourth Amendment applies only to "constitutionally protected areas" such as a person's house or curtilage. *See, e.g., Olmstead v. United States,* 277 U.S. 438, 466, 48 S.Ct. 564, 568, 72 L.Ed. 944 (1928) and *Silverman v. United States,* 365 U.S. 505, 510, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). Clearly, under *Hester,* an open field was not viewed as a constitutionally protected area. The concept of constitutionally protected areas was reconsidered and arguably overruled in *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). In that case, FBI agents "bugged" a public telephone booth by attaching an electronic listening and recording device on the outside of the booth. The Supreme Court had to decide whether this technical trespass amounted to a constitutional violation. Both parties attempted to explain why the public telephone booth was or was not a "constitutionally protected area." Speaking for the majority, Justice Stewart rejected this analysis.

> [W]e have never suggested that this concept can serve as a talismanic solution [to] every Fourth Amendment problem.... [T]his effort to decide whether or not a given 'area', viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

*Id.* at 351 & n. 9, 88 S.Ct. at 511 & n. 9 (citations and footnote omitted). The Court also rejected the Government's argument that no violation had occurred because the "bugging" had not involved a physical intrusion into the phone booth.

> [O]nce it is recognized that the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

*Id.* at 353, 88 S.Ct. at 512. Thus, the *Katz* Court held that *Olmstead*'s focus on the area of the violation was no longer controlling and concluded that a constitutional violation had occurred here because the Government's activities had "violated the privacy upon which [Katz] justifiably relied while using the telephone booth...." *Id.*

In his oft-quoted concurring opinion, Justice Harlan articulated the standard defining places where a person has a reasonable expectation of privacy. First, a person must show he had an "actual (subjective) expectation of privacy." *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Second, if such a showing is made, it must be examined objectively to determine whether that subjective expectation is "one that society is prepared to recognize as 'reasonable'." *Id.* Justice Harlan's analysis has now become the standard for resolving questions of expectations of privacy. R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure,* § 25.1 at page 282 n. 3 (1983) (*citing Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580–81, 61 L.Ed.2d 220 (1979) and *Rakas v. Illinois,* 439 U.S. 128, 143–44 & n. 12, 99 S.Ct. 421, 430–31 & n. 12, 58 L.Ed.2d 287 (1978)).

Left unanswered was what impact the *Katz* "reasonable expectation of privacy" approach had on the vitality of the open fields doctrine. Had the doctrine been overruled by *Katz*? Was there now a need to examine an open fields' owner's reasonable expectation of privacy? Or did *Hester* live on because there could be no reasonable expectation of privacy in an open field? The Supreme Court has cited *Hester* as controlling authority in several post-*Katz* decisions where the owner of non-open fields property displayed no reasonable expectation of privacy.[3] The Court has not

---

3. See *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 352, 97 S.Ct. 619, 628, 50 L.Ed.2d 530 (1977); *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 2116, 40 L.Ed.2d 607 (1974); *compare United States*

squarely addressed the use of the open fields doctrine in a case where it was arguable that a reasonable expectation of privacy existed.[4]

Federal and state decisions have divided on the continued use of *Hester*'s open fields doctrine in light of *Katz'* reasonable expectation of privacy approach. Some courts have held that the open fields doctrine remains a per se rule regardless of any privacy expectations because society does not recognize the right to privacy over open fields. *United States v. Oliver*, 686 F.2d 356, 360 (6th Cir.1982) (en banc), *cert. granted*, —— U.S. ——, 103 S.Ct. 812, 74 L.Ed.2d 1012 (1983); *Skipper v. State*, 387 So.2d 261, 265–68 (Ala.Cr. App.), *cert. denied*, 387 So.2d 268 (Ala.1980); *State v. Simpson*, 639 S.W.2d 230, 232 (Mo.App.1982); *Anderson v. State*, 658 P.2d 501, 502–03 (Okl.Cr.App.1983). Other courts have concluded that the open fields doctrine was overruled *sub silentio* by *Katz* and focused the analysis only on the reasonable expectation of privacy. *State v. Caldwell*, 20 Ariz.App. 331, 512 P.2d 863, 867 (1973); *Burkholder v. Superior Court*, 96 Cal.App.3d 421, 427, 158 Cal.Rptr. 86 (1979); *State v. Walle*, 52 Or.App. 963, 630 P.2d 377, 381 (1981). The large majority, however, have

---

*v. Knotts*, —— U.S. ——, —— & ——, 103 S.Ct. 1081, 1085 & 1086, 75 L.Ed.2d 55, 62 & 64 (1983) (citation to *Hester*) *with United States v. Knotts*, —— U.S. at ——, 103 S.Ct. at 1088, 75 L.Ed.2d at 66 (1983) (Blackmun, J., concurring in the judgment) (majority opinion's citation to the open fields doctrine is unnecessary).

**4.** Three cases presenting variations of this issue are presently pending before the High Court. *See United States v. Oliver*, 686 F.2d 356 (6th Cir.1982) (en banc) (as a matter of law, a defendant-landowner can have no reasonable expectation of privacy with respect to an open field on his land), *cert. granted*, —— U.S. ——, 103 S.Ct. 812, 74 L.Ed.2d 1012 (1983); *State v. Thornton*, 453 A.2d 489 (Me.1982) (open fields doctrine not applicable to justify warrantless search of defendant's land), *cert. granted*, —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 944 (1983); *State v. Brady*, 406 So.2d 1093 (Fla.1982) (open fields doctrine not applicable where officers crossed a dike, rammed through one gate, cut the chain lock on another gate, cut or crossed several posted fences, and proceeded several hundred yards before they were in a position to observe criminal activity), *cert. granted*, 456 U.S. 988, 102 S.Ct. 2266, 73 L.Ed.2d 1282 (1982).

**560**

harmonized the *Hester* and *Katz* decisions by holding that the Fourth Amendment does not apply to searches and seizures made pursuant to observations across open fields where the area observed is not subject to a reasonable expectation of privacy. *United States v. Lace,* 669 F.2d 46, 50 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); *Patterson v. National Transportation Safety Board,* 638 F.2d 144, 146 (10th Cir.1980); *United States v. Ramapuram,* 632 F.2d 1149, 1155 (4th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *United States v. Freie,* 545 F.2d 1217, 1229 (9th Cir.1976), *cert. denied sub nom., Gangadean v. United States,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977); *United States v. DeBacker,* 493 F.Supp. 1078, 1081–81 (W.D.Mich.1980); *Gaylord v. State,* 1 Ark.App. 106, 613 S.W.2d 409, 412–13 (1981); *People v. McClaugherty,* 193 Colo. 360, 566 P.2d 361, 362–63 (1977); *State v. Brady,* 406 So.2d 1093, 1098 (Fla.1982), *cert. granted,* 456 U.S. 988, 102 S.Ct. 2266, 73 L.Ed.2d 1282 (1983); *Giddens v. State,* 156 Ga.App. 258, 274 S.E.2d 595, 597, *cert. denied,* (Ga.1980), *cert. denied,* 450 U.S. 1026, 101 S.Ct. 1733, 68 L.Ed.2d 220 (1981); *State v. Stachler,* 58 Haw. 412, 570 P.2d 1323, 1328–29 (1977); *People v. Dasenbrock,* 96 Ill.App.3d 625, 52 Ill.Dec. 85, 87–88, 421 N.E.2d 948, 950–51 (1981); *State v. Bakker,* 262 N.W.2d 538, 546–47 (Iowa 1978); *State v. Byers,* 359 So.2d 84, 86 (La.1978); *State v. Thornton,* 453 A.2d 489, 496 (Me.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 944 (1983); *State v. White,* 332 N.W.2d 910, 911 (Minn.1983); *State v. Cemper,* 209 Neb. 376, 307 N.W.2d 820, 822–23 (1981); *State v. Hanson,* 113 N.H. 689, 313 A.2d 730, 732 (1973); *State v. Chort,* 91 N.M. 584, 577 P.2d 892, 893 (N.M.App.1978); *State v. Bernath,* 3 Ohio App.3d 229, 444 N.E.2d 439, 441 (1981); *Commonwealth v. Beals,* 313 Pa.Super. 346, 459 A.2d 1263, 1266–67 (1983); *State v. Doelman,* 620 S.W.2d 96, 99 (Tenn.Cr.App. 1981); *State v. Shreve,* 667 P.2d 590, 591 (Utah 1983); *State v. Weigand,* 289 S.E.2d 508, 510 (W.Va.1982); *Conrad v. State,* 63 Wis.2d 616, 218 N.W.2d 252, 258–59 (1974).

Although the open fields doctrine has never expressly been applied in Maryland, the Court of Appeals has recognized that there are areas beyond a residence's curtilage where the owner may not have a legitimate expectation of privacy. *Everhart v. State,* 274 Md. 459, 486, 337 A.2d 100 (1975). At issue in that case was whether the warrantless search and seizure of closed trash bags from an area near a house was unlawful. The trash bags contained controlled dangerous substances. The Court of Appeals was unable to state whether the search was constitutionally impermissible because the record was not clear whether the bags were abandoned property or whether the bags were situated within the house's curtilage. As the hearing judge had limited his review to the "four corners" of the search warrant affidavit in determining probable cause, the *Everhart* Court reversed the judgments and instructed the trial court on remand to consider, among other things, whether the bags were illegally searched and seized.

From those post-*Katz* decisions that tend to synthesize or disregard *Hester,* there appear to emerge certain criteria to be followed where an open field is involved. First, for the open fields doctrine to apply, the area searched must be beyond the curtilage. Generally speaking, a property owner will keep those items he wishes to protect from the public at large closer to home.

Next, the property owner must exhibit a subjective expectancy of privacy. Such subjective expectancies indicate an intent to keep trespassers off the lands and are discerned from the posting of signs and the building of fences or gates. *State v. Brady,* 406 So.2d at 1097 (locked fence and dike surrounding property plus presence of signs manifested subjective expectation of privacy); *State v. Byers,* 359 So.2d at 86 (posted signs); *State v. Thornton,* 453 A.2d at 491, 496 (presence of stone wall and barbed wire fence around perimeter of property and no trespassing signs manifested subjective expectation of privacy); *State v. Chort,* 577 P.2d at 893 (placement of five foot fence

around garden manifested subjective expectation of privacy); *State v. Walle*, 630 P.2d at 381 (property protected by fence and gully manifested subjective expectation of privacy where no evidence suggested that owner had permitted roaming nudists to enter onto land). The presence, however, of gates or signs is not always determinative of an expectation of privacy. No subjective expectation of privacy exists where the physical and visible restraints are unenforced, *United States v. Edmonds*, 611 F.2d 1386, 1388 (5th Cir.1980) (presence of no trespassing sign does not invalidate seizure where evidence showed that public had been welcome in posted area), where illegal activity can be seen from an adjacent property, *Gaylord v. State*, 613 S.W.2d at 413 (marijuana patch visible from road), or where a defendant does not own the subject property, *People v. McClaugherty*, 566 P.2d at 363, *State v. Bakker*, 262 N.W.2d at 547, *State v. Cemper*, 307 N.W.2d at 823, *Goehring v. State*, 627 S.W.2d 159, 165 (Tex.Cr.App.1982); *State v. Shreve*, 667 P.2d at 591. No subjective expectation of privacy exists from overflights, *Dean v. Superior Court*, 35 Cal.App.3d 112, 117–18, 110 Cal.Rptr. 585 (1973) (surveillance from 300 to 700 feet); *People v. Lashmett*, 71 Ill. App.3d 429, 27 Ill.Dec. 657, 389 N.E.2d 888, 890 (1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980) (surveillance from 2400 feet); *but see, People v. Sneed,* 32 Cal.App.3d 535, 542–43, 108 Cal.Rptr. 146 (1973) (expectation of privacy exists from surveillance from 20–25 feet), even where signs and/or gates are present, *United States v. DeBacker*, 493 F.2d at 1081; *State v. Stachler*, 570 P.2d at 1328; *Commonwealth v. Beals*, —— Pa.Super. at ——, 459 A.2d at 1267, Annot., 56 A.L.R.Fed. 772, § 4 (1982). Quite clearly, no subjective expectation exists where a property owner has made no attempt to exclude the public. *United States v. Lace*, 669 F.2d at 50–51; *Patterson v. National Transportation Safety Board*, 638 F.2d at 146; *United States v. Miller*, 589 F.2d 1117, 1134 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979);

*Patler v. Slayton,* 503 F.2d 472, 478 (4th Cir.1974); *State v. Doelman,* 620 S.W.2d at 99.

 If a property owner shows a subjective expectation of privacy, that expectation must be scrutinized under an objective standard to determine whether it is legitimate or reasonable. Such a finding can only be made by examining the totality of the circumstances surrounding the expectation to ascertain whether that expectation is "one that society is prepared to recognize as reasonable." *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). A trial court's determination that a reasonable expectation of privacy exists "is a legal conclusion involving substantive Fourth Amendment analysis" subject to appellate review. *United States v. Vicknair,* 610 F.2d 372, 379 (5th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980). Of course, the facts underlying a trial judge's determination are not reviewable unless inherently improbable. *State v. Borgen,* 58 Md.App. 61, 72, 472 A.2d 114 (1984). Legitimate expectations of privacy have been found to exist under an objective standard in *State v. Brady,* 406 So.2d at 1097; *State v. Thornton,* 453 A.2d at 496; *State v. Chort,* 577 P.2d at 893. We do not intend that these cases serve as future models for determining whether an objective standard has been shown. Instead, we merely cite them as examples of where the totality of the circumstances presented such a showing.

 Finally, consideration should be given to the police conduct attending an open fields search. Mere trespass alone will not vitiate an otherwise lawful search since "any information gained as a result of a civil trespass ... is not constitutionally tainted, nor is the search and seizure which ultimately results from acquiring that information." *United States v. Capps,* 435 F.2d 637, 640 (9th Cir.1970) (and cases cited therein). *See also Atwell v. United States,* 414 F.2d 136, 138 (5th Cir.1969). While police may trespass upon an individual's property to make an open fields observation, they may not trespass upon and search the house or

curtilage and may not physically enter enclosed buildings. *United States v. Gustavo Diaz-Segovia,* 457 F.Supp. 260, 270 (D.Md.1978).

> If the agent, through his observations, develops probable cause to believe that a crime is being committed, he may further enter the property in order to effect an arrest. However, he must obtain a search warrant in order to enter and search any building, vehicle, etc. which hides items sheltered from public view.

*Id.*

■ Turning to the facts of the instant case, were we to follow *Hester* without consideration of the *Katz* and post-*Katz* decisions heretofore mentioned, our analysis would be at an end. The trailers were in an open field and beyond the pale of the Fourth Amendment, and thus, the search would be lawful. Applying the criteria we have explained, we arrive at the same ineluctable conclusion that the Fourth Amendment does not protect appellant from the open fields observation made on December 6, 1982, by Trooper Layton. We have no difficulty stating that the trailer was located beyond the curtilage of appellant's house. The trailer was situated off a series of logging paths more than a mile from the house. There was no indication that the trailer or the surrounding area was used for habitation. In fact, the area was strewn with junk. All these factors support a finding that this area was not used for domestic purposes.

There was no exhibition of a subjective expectation of privacy. Any citizen could have wandered from the Millington Wildlife Management area onto the appellant's property without being aware that he had left the wildlife area. No signs or fences precluded entry onto the land. The fact that string and boundary lines enclosed another part of the property and that signs were posted on the property's main drive strengthens the determination that appellant did not intend to restrict the public from entering his property near the area where the trailers were located.

Likewise, appellant displayed no subjective expectation of privacy over the contents of the trailer. There was no door or lock. There was no sign demonstrating ownership or warning trespassers to go away. Rather, the trooper observed only an old board acting as "a ragged type of door." The drying marijuana was clearly visible from outside the trailer. Trooper Layton did not have to enter. Our conclusion as to the expectation of privacy as to the trailer would be the same even if the trailer had been locked. Because the trailer, which was clearly not used as a dwelling, was beyond the curtilage, any subjective expectation of privacy would be diminished because the trailer was still in an area unprotected by the Fourth Amendment. *See, United States v. Ramapuram,* 632 F.2d at 1149 where government agents opened a locked trunk of a "junker" car situated in an open field.

As no subjective expectation of privacy was shown, there is no need to determine whether an objective expectation existed.

Finally, we look to Trooper Layton's conduct. While he may have committed an inadvertent trespass, he proceeded no further than was necessary. He remained outside appellant's home and curtilage. Trooper Layton left appellant's property to obtain a search warrant the moment he substantiated the informant's information.

In sum, the Fourth Amendment does not apply to open field searches such as the one conducted by Trooper Layton. Thus, we need not address appellant's argument that the trooper's observations violated the "plain view" exception to warrantless searches. Trooper Layton's observations supported a finding of probable cause and the issuance of the first warrant.[5]

Appellant claims that "if the initial warrantless intrusion of Trooper Layton into the trailer is determined to be

---

5. On appeal, appellant has abandoned the argument that the warrants did not describe with particularity the items to be seized. Hence, we do not address this issue.

illegal, then all the evidence against appellant which flowed therefrom must be suppressed." As we have concluded that the trooper's observations did not infringe upon any Fourth Amendment right held by appellant, it must logically follow that under the facts presented in this case all the evidence seized was properly admissible. Appellant's counsel conceded as much at the suppression hearing with respect to the evidence seized from the truck "in view of the court's ruling" regarding the search warrant. Accordingly, Chief Judge Rasin correctly denied appellant's motion to suppress.

## II. *Allegations of Double Jeopardy*

Appellant complains that his two convictions for possession with intent to distribute marijuana arising out of the December 7th and 8th offenses violate principles of double jeopardy. Alternatively, appellant argues that the two convictions should have been merged for sentencing purposes.

At no time before, during, or after trial did appellant assert that the separate counts stemming from the December 7th and 8th illegalities should be dismissed on double jeopardy grounds. Therefore, appellant failed to preserve this issue for appellate review. Maryland Rule 1085. While the Court of Appeals has held that a defendant need not raise a motion to dismiss for double jeopardy reasons prior to trial, *Carbaugh v. State*, 294 Md. 323, 327–28, 449 A.2d 1153 (1982), we do not read that decision as holding that the objection may be raised for the first time on direct appeal.

There was no reason to merge the December 7th and 8th violations.

If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited.

*Newton v. State,* 280 Md. 260, 268, 373 A.2d 262 (1977). While the charges involved similar crimes, the facts necessary to prove those crimes were different. The December 7th charges resulted from the marijuana seized in the three trailers. The December 8th charges resulted from the marijuana seized in appellant's home. The seized marijuana was kept in two separate caches more than a mile apart. Thus, at trial, the State was required to prove different facts for each charge.

We reject appellant's contention that "whenever a criminal transaction is of a continuing nature, the defendant can only be indicted and convicted for one violation." Were such a contention correct, large scale drug dealers would be encouraged to spread their illegal operations over several locations knowing that they would only be charged with a single count of possession with intent to distribute. Such a result would not comport with the declared legislative intent to prevent the illegal manufacturing, distribution, possession and administration of controlled dangerous substances. Md.Ann.Code, art. 27, § 276(a). The Legislature has pronounced that Maryland's controlled dangerous substances law "shall be liberally interpreted and construed so as to effectuate its general purpose ...." Art. 27, § 276(b). In order to effectuate this general purpose, we refuse to adopt such an inflexible rule as the one proposed by appellant. Instead, we believe that the determination of the number of offenses should be determined by trial judges on a case-by-case basis. Elements such as the time and distance between the offenses as well as the amounts seized at the different locations are relevant considerations.

We observe that Chief Judge Rasin considered the one mile distance between the two drug depositories. He further considered the timespan between the seizures. A sufficient quantity of marijuana was found at both locations to justify a finding of intent to distribute. Scales and other paraphernalia were also found in the trailers and the house. In light of these facts, we hold that no merger was required.

III. *Handgun Violation*

 Appellant posits that his handgun violation conviction was unlawfully obtained because Md.Ann.Code, art. 27, § 36B (1982 Repl.Vol., 1983 Cum.Supp.) impermissibly placed the burden on him to prove that his actions were within that statute's recognized exceptions. This argument has been raised and rejected on prior occasions. *Spurrier v. State*, 229 Md. 110, 112, 182 A.2d 358 (1962); *Jordan v. State*, 24 Md.App. 267, 274, 330 A.2d 496 (1975). There is nothing inherently unconstitutional about requiring a defendant to come forward with information particularly within his knowledge to show that he comes within one or more of the statutory exceptions. In fact, it is to his advantage to produce such evidence.

 At the same time, perhaps anticipating our rejection of the previous argument, appellant questions the sufficiency of the evidence to support his handgun violation conviction. He insists that "it is reasonably inferrable from the record that appellant conducted a nursery business in the proximity of the trailers and that he was carrying the handgun to his place of business." *See* Art. 27, § 36B(c)(3). While appellant contested the sufficiency of the evidence at trial, he focused his attack there on whether the subject rifle was within the definition of Art. 27, § 481C(a)(4) and on the aforementioned burden of proving an exception to the handgun violation statute. When a party specifies a ground for objection at the trial below, he is precluded from raising a new ground of objection on appeal. *vonLusch v. State*, 31 Md.App. 271, 285–86, 356 A.2d 277, *rev'd on other grounds*, 279 Md. 255, 368 A.2d 468 (1977). Thus, appellant's newly raised argument concerning his gardening enterprise has not been preserved for appellate review. We note, however, that there was no evidence produced at the trial to substantiate appellant's claim that he conducted a nursery business near the trailers. In view of the "junkyard" nature of the area surrounding the trailers, we find appellant's assertion ludicrous.

## IV. *Entrapment*

Lastly, appellant claims that he was entrapped into the commission of the handgun offense. He argues that he was carrying the handgun in order to investigate the police lights visible from the area where the trailers were situated.

We are not unaware of the blatant inconsistency between the arguments appellant presents in Parts III and IV of this opinion. We question whether one would carry a handgun both to investigate the presence of intruders and to tend to one's nursery business at 1:30 in the morning. In any event, we reject appellant's entrapment argument. In order to make out an entrapment defense, it must be shown that there was inducement on the part of the police and that the defendant showed no predisposition to commit the offense. *Bowser v. State,* 50 Md.App. 363, 369, 439 A.2d 1 (1981). The presence of police searchlights does not present inducement to commit a handgun violation. Further, in his brief appellant admits that he carried the handgun in order to investigate the disturbance near the trailers. Consequently, appellant has conceded he was predisposed to commit the handgun violation. There was no entrapment.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.